**Marcia N. HAYNES, Appellant,**

v.

**SOUTH COMMUNITY HOSPITAL MANAGEMENT, INC., Nancy Hufschmid, Donna Dodd, and Paula Slover, Appellees.**

**No. 70507.**

Court of Appeals of Oklahoma, Division No. 3.

May 22, 1990.

Patrick E. Carr, Tulsa, for appellant.

Dale Reneau, Michael D. Duncan, Oklahoma City, for appellees.

## MEMORANDUM OPINION

ADAMS, Judge:

Marcia Haynes sued for intentional infliction of emotional distress and malicious interference with contractual relationship, naming as defendants South Community Hospital Management Inc., Nancy Hufschmid, Donna Dodd, and Paula Slover. Only the individual defendants were named in the count alleging contractual interference. The trial court sustained the defendants' Motion for Summary Judgment. Haynes appeals, claiming error in that order and in an order overruling her Motion to Reconsider and Motion for New Trial. She says issues remain for the jury, including the reasonableness of the defendants' actions and their interference with her contractual relationship.

We must determine whether there is any substantial controversy as to material facts, or whether on undisputed facts reasonable people, exercising fair and impartial judgment could reach different conclusions. *Flanders v. Crane Company*, 693 P.2d 602 (Okla.1984). Reviewing the evidentiary materials presented in support of and in opposition to the Motion for Summary Judgment, and considering them in the light most favorable to Haynes, we conclude that the trial court properly granted summary judgment.

## THE FACTS

We may safely say from the record that the following facts are either undisputed, or if disputed, are recited accepting Haynes' assertions as true.

Hufschmid is Director of Nursing at the hospital where Haynes was employed as a registered nurse. South Community Hospital Management, Inc., operates the hospital. Dodd and Slover are fellow nursing employees.

Sometime prior to November 20, 1984, Hufschmid learned from employees, includ-

ing Dodd and Slover, that someone might have diverted medications from patients. Specifically, some two weeks prior to November 20, 1984, Hufschmid learned a patient's urine test showed no narcotic while records indicated the drug had been administered. Hufschmid also learned that on November 14, 1984 another patient's urine test was negative for medication which records reflected had been given. Other employees told Hufschmid they found used syringes and bloody towels or sponges in a nurses' lounge. Hufschmid also learned that for at least three patients medications were not properly charted.

Conducting an investigation, on the morning of November 20, 1984, Hufschmid asked Haynes, Slover, and two other nurses, who worked on the same floor, to give urine samples for a drug screen. On that morning, Hufschmid's conversation with Haynes concerning the urine test ended with Haynes' resignation. Haynes contends Hufschmid's statements and actions during this conversation constitute intentional infliction of mental distress, and this tort was complete on Haynes' resignation.

For purposes of determining an appeal from summary judgment, we must take Haynes' version of this conversation as true. She testified as follows:

She told me they were going to do a drug screen on my urine. I told her I took a Tylox last night at 6:00 o'clock, and "I'd like for you to give me a statement, stating that, yes, I did take a Tylox. I don't care about a drug screen, whatever else they want to find is fine. But, if they find Tylox, I want you to know I have a legal prescription for it, and I did take it at 6:00 o'clock. I have admitted this, and I am replying [sic] with your request for a urine specimen."

She agreed to do it. So, we went into the bathroom, I gave her the urine specimen. She labeled it, she put it on her desk. I sat down, and I said, "I hope this takes care of it all. As soon as I get my statement I'll go back to work, or whatever you want me to do."

She said, "You're getting no statement today."

I said, "I don't understand, I thought that was our understanding, that I was to get a written statement."

She said, "I can't give that written statement without speaking with someone named Steve." And, I thought Steve was the hospital attorney, but it turns out, he was something to do with Human Resources, and I'm not sure exactly what.

And, I said, "Is he here, could you call him. I want to go back to work, or I want to do what you want me to do, but I do not want to leave the urine specimen without the statement."

She said, "It will take three to four days to get that statement for you. I'm not going to bother Steve in his office, I'm not even sure if he is in the hospital."

And, she said, "If you don't like that, you may resign." And, she handed me a pencil and a piece of paper, and I wrote out a written resignation to which I asked her to add that two weeks notice was not necessary. I volunteered to finish out the shift, and she said, that would not be necessary, I was free to leave at that time.

So, I picked up the urine specimen, and I left.

On January 5, 1985, Hufschmid filed a complaint with the Oklahoma Board of Nurse Registration and Nursing Education. Quoting the statutory grounds for removal contained in 59 O.S.1981 § 567.8, Hufschmid alleged Haynes was "guilty of unprofessional conduct" and was "unfit to practice nursing by reason of disreputable habits and gross negligence." Hufschmid's complaint supported these generalized grounds by alleging that Haynes failed to document narcotics administrations in two described instances, and that medications may not have been administered in other cases. Proceeding on that complaint, the Board determined evidence was insufficient for disciplinary action and found Haynes not guilty of unprofessional conduct.

## TRIAL COURT PROCEEDINGS

Responding to Haynes' initial petition which included a count for libel, the defen-

dants argued the statements made in the complaint to the Board were privileged under 12 O.S.1981 § 1443.1. Haynes dismissed her libel count and argued that the privilege applies only to libel actions. In addition, she argued in the trial court, and repeats the argument here, that her cause of action for intentional infliction of mental distress and interference with contractual relations was complete and the damage done prior to Hufschmid's complaint. Therefore, our analysis must focus on whether defendant's acts and statements prior to Haynes' resignation gives rise to a claim under either of those theories.[1]

The trial court determined the statutory privilege prevented recovery on the theory of intentional infliction of mental distress, and that the undisputed facts and inferences showed there existed no claim for interference with contractual relations. In their brief, the defendants also contend that under the undisputed facts Haynes is not entitled to recover for intentional infliction of mental distress under *Breeden v. League Services Corp.*, 575 P.2d 1374 (Okla.1978).

■ Even if the trial court erred in determining the privilege applied in the face of Haynes' clear contention that the claim with the Board did not constitute part of her cause of action for intentional infliction of mental distress or interference of contractual relations, such error would not dictate reversal. A trial court judgment, even if based upon incorrect reasons, will be affirmed where, as here, its ultimate conclusion is correct under the law. *Russell v. Flanagan*, 544 P.2d 510 (Okla.1975).

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ Recovery for intentional infliction of emotional distress requires proof a defendant's conduct was extreme and outrageous as defined in Restatement of Torts (Second), 1965, Section 46. Section 46 standards were adopted as the law of Okla-

homa in *Breeden v. League Services Corp.*, 575 P.2d 1374 (Okla.1978). Comment d to Section 46 notes, in pertinent part:

... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express and unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam....

Cited with approval, *Breeden v. League Services Corp.*, 575 P.2d at 1376.

■ In the first instance, the trial court must determine, as a matter of law, whether the conduct is sufficiently extreme and outrageous as to allow recovery under the Section 46 standards. The issue is submitted to the jury only if reasonable minds could differ over whether the conduct was sufficiently extreme and outrageous to allow recovery. Further, conduct is not to be viewed in a sterile, detached atmosphere, and the circumstances surrounding the conduct affect whether actions are reasonable. *Eddy v. Brown*, 715 P.2d 74 (Okla.1986).

■ Viewed in the light most favorable to Haynes, this record establishes:

---

**1.** We note much of Haynes' brief is devoted to demonstrating lack of evidence supporting Hufschmid's complaint to the Board. She does so in an attempt to demonstrate lack of good faith by Hufschmid, arguably defeating any claim of privilege. Since our decision does not rest upon any privilege, we need not consider that issue here.

(1) Hufschmid learned from other employees of possible diversions of medication from patients;

(2) Hufschmid conducted an investigation;

(3) In the course of that investigation, Hufschmid requested urine samples for drug screening from Haynes and other nurses on the floor;

(4) When initially requested, Hufschmid agreed to give Haynes a written statement acknowledging Haynes' admission that she had taken a prescription medication the evening prior to the sample;

(5) When Haynes produced the sample, Hufschmid told Haynes there would be a delay of three or four days in getting the written statement; and

(6) Hufschmid told Haynes "if you don't like that, you may resign" and handed her a pen and a piece of paper.

The record does not support claims contained in Haynes' brief that Hufschmid "shoved" a pen and paper at Haynes or "refused" to give Haynes the requested statement. The picture painted by this undisputed evidence is of a supervisor conducting an investigation of a possible breach of hospital rules and regulations. There is no suggestion in the evidence that Ms. Hufschmid used any physical actions to intimidate or otherwise coerce Haynes. While one may argue Hufschmid exercised poor judgment in initially agreeing to furnish the written statement without making it clear that there would be a delay, reasonable people could not conclude that action was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement of Torts 2d, 1965 § 46, comment d. The conduct about which Haynes complains does not meet the standard set out in § 46 and adopted in *Breeden*, and recovery is not permissible as a matter of law.

## MALICIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

■ Citing no authority whatsoever, Haynes contends that the trial court erred in finding there were no issues of material facts concerning whether the defendants had improperly interfered with her business relations with the hospital. She premises this argument on her claim that Hufschmid "refused" to provide her with the promised statement, and acted with malice and ill will when she "shoved" the pencil and paper in front of her. As noted above, Haynes' own version of her discussion and conversation with Hufschmid reveals those "facts" to be incorrect.

■ As stated by the Oklahoma Supreme Court in *Mac Adjustment, Inc. v. Property Loss Research Bureau*, 595 P.2d 427, 428 (Okla.1979); the elements of malicious interference with contractual relations are:

1. That he or she had a business or a contractual right that was interfered with.

2. That the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable.

3. That damage was proximately sustained as a result of the complained of interference.

The law allows interference with the employment of another if done by fair means, if under justifiable cause, if to better one's business, and if not principally to harm another. *Del State Bank v. Salmon*, 548 P.2d 1024 (Okla.1976).

Defendants produced admissible evidence of a proper purpose for their actions. They found incomplete medication records and suspicious materials. They had a duty to protect the patients under their care. While Appellant contends the investigation was a smoke screen to discredit her, she provides no admissible evidence of an improper or unjustified act by Appellees.

Appellant had the burden of producing admissible evidence controverting that of Appellees. *Runyon v. Reid*, 510 P.2d 943 (Okla.1973). She has not done so. The mere contention that facts exist or might exist is not sufficient to create a substantial controversy when the party seeking

**308**

summary judgment has introduced evidence which defeats recovery. *Mengel v. Rosen*, 735 P.2d 560 (Okla.1987).

Our review of the record indicates no substantial injustice in the trial court's ruling on the contractual interference claim, and we need not consider this contention of error further.

AFFIRMED.

HANSEN, P.J., and BAILEY, J., concur.