Ali DAEMI, Plaintiff–Appellant,

v.

CHURCH'S FRIED CHICKEN, INC.,
Defendant–Appellee.

No. 86–1584.

United States Court of Appeals,
Tenth Circuit.

April 23, 1991.

R.V. Funk, Judd James, Tulsa, Okl., for plaintiff-appellant.

Timothy E. McCormick, Tulsa, Okl., for defendant-appellee.

Before HOLLOWAY, Chief Judge, and SETH and ANDERSON, Circuit Judges.

HOLLOWAY, Chief Judge.

Plaintiff-appellant Daemi, a non-white person of Iranian descent, commenced this action against Church's Fried Chicken, Inc. (CFC) under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that CFC discriminated against him on the basis of race and national origin. Daemi also asserted pendent state-law claims for intentional infliction of emotional distress, breach of contract, and wrongful termination. Following a bench trial, the district court entered judgment against Daemi on all of his claims and he appeals.

I

There is record evidence to show the following:

Daemi started working for CFC in June 1980 and, with the exception of a six-month period in 1981, continued working for CFC until his resignation in June 1983. CFC is a fast-food restaurant chain, specializing in

fried chicken. When Daemi started working for CFC, the relationship between the company and its employees was defined in part by certain manuals and handbooks.[1] Daemi was initially employed part-time as an hourly-wage employee in Joplin, Missouri. Shortly thereafter, he entered CFC's management program and advanced to the position of assistant manager in Joplin. In October 1980, Daemi moved to Tulsa, Oklahoma, where he took a position as senior manager. Daemi occupied that position for roughly six months, at which time he resigned and sought employment in the engineering field. He rejoined CFC in June 1981 as a senior manager in Joplin.

Daemi first became an area manager in November 1981 in CFC's Central Illinois area. Approximately seven months later, he accepted the area manager position in Tulsa. The district manager for the Tulsa area (Daemi's supervisor) was Glen Huffman. Huffman treated his subordinates harshly and openly admitted that he did not like blacks or Iranians. On several occasions, he made derogatory comments about CFC employees, including Daemi, based on their race or national origin. Specifically, he called Daemi a "damn Irish" or "damn Iranian." Further, Huffman indicated that he wished to have "clean, whitefaced American[s]" in CFC positions in the Tulsa market. Huffman threatened Daemi with loss of his job if he did not terminate or otherwise eliminate his Iranian subordinates. Huffman's conduct disturbed Daemi, who felt that Huffman treated him like "dirt." In October 1982, Huffman was discharged by CFC for certain financial misconduct unrelated to his discriminatory practices.[2] His position was filled the following month by Robert Vines.

Vines was regarded as a tough manager. He had a direct, aggressive manner which occasionally created tensions with his subordinates. Vines, however, was also generally regarded as fair. Daemi did not interact well with Vines. Daemi believed that Vines treated him poorly due to his race and national origin. Vines allegedly addressed Daemi in blunt language (sometimes in front of his subordinates), and was not receptive to Daemi's work-related ideas and concerns. Vines made Daemi feel ignorant and worthless. His conduct also allegedly caused Daemi to experience stress-related stomach disorders. Unlike Huffman, however, Vines did not hurl ethnic or racial slurs at Daemi or other CFC employees.

According to Daemi, Vines did direct him to eliminate Iranian employees in the Tulsa market. Further, Vines allegedly belittled and otherwise mistreated Daemi at CFC seminars. For example, at a seminar held in Oklahoma City in June 1983, Vines did not recognize Daemi for his work as an area manager. The seminar was in fact designed to recognize store managers who had attained the coveted CFC title of Master Merchant.[3] However, Daemi thought that some area managers were recognized for their job performance and felt deeply embarrassed and hurt by Vines' failure to recognize him.

Vines also required Daemi to take a polygraph test on one occasion. While Daemi

---

1. Among the manuals and handbooks used by CFC were the Management Manual (MM) and the Field Operations Manual (FOM). The MM was available in every CFC store. It instructed store managers on a number of personnel matters, including the disciplining and discharge of employees. The FOM, on the other hand, was not distributed to CFC stores but, instead, was given only to CFC executives, including area managers. It was designed to familiarize them with the many administrative functions of CFC and to instruct them in certain personnel matters including the processing of discrimination complaints and the transfer of employees. *See* Appellant's Brief–in–Chief, Ex. B, at 5–6; II Supp.R. (MM), at 6–22 to 6–23; III Supp.R. (FOM), Nos. 13.104, 17.235, 17.595.

2. Specifically, Huffman was discharged for procuring an air conditioner motor for his personal use and directing Daemi to bill it to CFC. It was CFC's position that Huffman's conduct not only amounted to an inexcusable abuse of the company, but also of one of its employees, in that he caused Daemi to engage in conduct that might have resulted in his discharge. *See* Appellant's Brief–in–Chief, Ex. B, at 22–25, 26–27.

3. The Master Merchant program was instituted by CFC in approximately 1972 as a vehicle for recognizing, and thus inspiring, excellence in the job performance of its employees and, in particular, store managers.

was on vacation, two stores in his area were robbed of approximately $15,000. Vines undertook an investigation of the robberies and learned from CFC employees that a rumor was spreading that Daemi was involved. Vines' suspicions were aroused. He informed Daemi of the rumor and asked him to take a polygraph examination to "clear the air." Vines told Daemi that it was important in his position as area manager that he be responsible and an example to his subordinates. Vines had dealt with similar robbery cases involving whites where he did not ask the area managers to take polygraph examinations, but allegedly in those cases the area managers had not been identified by other employees as possible suspects. Daemi agreed to take the polygraph test, and he passed. Yet, he viewed Vines' instigation of the test as another instance of abusive treatment based on his race and national origin.

Vines was not pleased with Daemi's performance as Tulsa area manager. He did not doubt that Daemi worked hard. Daemi was in constant contact with the stores in his area. Often, when visiting a store, he would don a uniform and spend long hours behind the counter serving customers. Moreover, while Daemi was Tulsa area manager, three stores attained Master Merchant status—the first stores ever to do so in the Tulsa area.

However, Vines believed that Daemi did not "work smart." According to Vines, area managers were generally not supposed to physically work in the stores. Rather, their principal function was to hire and train personnel. Vines found Daemi's performance of this function to be inadequate. Vines observed that there was considerable turnover of personnel in Daemi's stores, creating a manpower shortage, and Daemi was having difficulties hiring an adequate number of new employees to keep the stores fully staffed. On one occasion, Vines personally assisted Daemi in hiring employees, but the manpower problems persisted. Further, Vines noted that there were repeated cash shortages at sev-

eral of Daemi's stores, in combined amounts ranging from $50 to $200 per day. Often, he also found that Daemi's stores were unclean.

Vines orally counseled Daemi regarding his performance deficiencies, but observed little improvement. Eventually, Vines asked his superior Ed Marlette to come to Tulsa to speak with Daemi about his performance. Marlette did so in the spring of 1983. In a meeting attended by Vines, Daemi promised Marlette that he would try to do better. Daemi did try, but Vines found the results to be lacking.

Accordingly, Vines gave Daemi the option of either accepting a demotion to store manager or quitting. Vines explained to Daemi that the demotion would in no way foreclose his future advancement in CFC and that it might be a good move for him because as a store manager Daemi would have more time to spend with his family. Vines told Daemi that with the aid of Marlette he would attempt to set up a special pay plan that would ensure that Daemi lost no income due to the demotion. The demotion proposal shocked and disturbed Daemi. At that time, however, he did not assert that it was unjust or discriminatory. Subject to receiving the store of his choice, No. 827, he accepted the demotion.

Yet, as structured by Vines and Marlette, the special pay plan was troubling to Daemi. While it was allegedly designed to benefit him, the pay plan was conditioned on Daemi meeting certain performance criteria. He had to receive satisfactory evaluations from his immediate supervisor, and, more importantly, he had to make Master Merchant within 120 days. Daemi was troubled by the evaluation requirement because he believed that at least in the short term Vines would be his immediate supervisor. Also, Daemi perceived the task of making Master Merchant within 120 days to be extremely difficult, if not impossible.[4] None of the white area managers demoted by Vines during roughly the same period

---

**4.** Indeed, it was the customary practice at CFC to give Master Merchant store managers who were transferred to non-Master Merchant stores

roughly 180 days to turn their new stores into Master Merchants and thereby retain their status. *See* II R. 54; III R. 142–43.

as Daemi were subject to the 120–day Master Merchant requirement.

Daemi apparently did not voice any objections regarding the special pay plan to Marlette, when Marlette discussed it with him, and the demotion was finalized. After working only two days in his new position, Daemi resigned. In his resignation letter, delivered to Vines, Daemi complained of his "unjust demotion." He subsequently filed a timely charge with the Equal Employment Opportunity Commission (EEOC). In his charge, Daemi alleged that CFC discriminated against him due to his national origin in violation of Title VII.

In his complaint Daemi asserted five claims against CFC, two under federal law and three under state law. Specifically, on the federal side, Daemi sought back pay and reinstatement under Title VII for alleged national origin discrimination, and compensatory and punitive damages under 42 U.S.C. § 1981 for alleged racial discrimination. On the state side, Daemi sought money damages from CFC for alleged intentional infliction of emotional distress (IIED), breach of contract, and wrongful discharge. The district court chose to exercise pendent jurisdiction over these state-law claims.

## II

Following the trial to the court, the district judge made findings and conclusions generally as follows:

Daemi filed a charge of discrimination on the basis of national origin with the EEOC and later received a right-to-sue letter, following which Daemi timely brought this action. During the eleven months that Daemi worked with his first district manager, Huffman, Huffman spoke derogatory words about Daemi and others but did not take any discriminatory actions against Daemi nor cause any adverse effect on Daemi's present or future employment. Huffman told Daemi he was a "damn Irish" or "damn Iranian" and that if he wanted to keep his job he should get rid of Iranians in his market. Huffman was served some Iranian food at a seminar and stated his dislike for it and Huffman openly admitted he disliked Iranians and blacks. Within a year of Daemi's firing, Huffman was terminated by Church's for his abusive style of supervision and for instructing Daemi to submit a bill to Church's for payment on an air conditioner motor that Huffman ordered and procured for home use.

Daemi's experiences with Huffman's replacement, Robert Vines, were perceived by Daemi to be discriminatory and harassing in that Daemi thought Vines was abusive and unfriendly, while being friendly to white employees. Daemi reported these views of discriminatory treatment to higher officials of CFC.

The court found that the situation existing between Vines and Daemi was that Vines simply found Daemi's job performance to be unsatisfactory; Daemi had no Master Merchant stores in his area when Vines replaced Huffman; Vines found that Daemi was unable to hire personnel; in stores where Daemi was in charge, Vines observed excessive employee turnover, cash shortages, merchandise shortages, and a general lack of training of employees.

In June 1983, Vines gave Daemi the opportunity of taking a demotion to a store manager's position or quitting. Daemi reacted with shock and rejected the first store suggested; they agreed on another store but Daemi worked only two days there and sent a letter of resignation. The court found that Daemi had difficulty controlling his area, insufficient management skills, and communication difficulties. When Daemi resigned, eight other Iranians were still employed in Daemi's area.

The court held that CFC did not commit an unlawful employment practice and did not discriminate against nor harass Daemi on the basis of national origin. The court held further that Daemi was not terminated. He resigned.

The court's conclusions cited the provisions in the EEOC regulations, 29 C.F.R. § 1606.8(b) that national origin harassment includes ethnic slurs or other verbal or physical conduct relating to an individual's

national origin that has the purpose or effect of creating an intimidating, hostile or offensive work environment. The court held that Daemi had not established a prima facie case of harassment regarding working conditions based on national origin. "The record in this case clearly shows Huffman's discriminatory comments to plaintiff did not unreasonably interfere with his work performance nor adversely affect his employment opportunities. The record is also clear that Robert Vines did not unlawfully discriminate against plaintiff. Plaintiff's work record as an area manager was poor." Daemi was held not entitled to recover under his claim based on Title VII.

The court also held that for like reasons, Daemi was not entitled to recover on a claim under 42 U.S.C. § 1981; Daemi resigned, effectively rejecting an offer of continued employment.

With respect to the claims of Daemi based on pendent jurisdiction and a breach of contract and wrongful termination claim, the court held that the employee handbooks and manuals of CFC constituted a contract between the parties and that no written employment contract, other than the handbooks and manuals, existed. The court concluded that CFC did not breach the contract or wrongfully terminate Daemi.

With respect to the claim of intentional infliction of mental distress, the trial judge held that the elements of such a cause of action were not established by a preponderance of the evidence, citing the strict requirements of law that the claim requires extreme or outrageous conduct intentionally or recklessly causing severe emotional distress.

We will deal with the details of the findings and conclusions further in portions of the opinion to follow.

## III

## FEDERAL CLAIMS

■ Generally, under Title VII or § 1981 a trial court's determinations as to disparate treatment and constructive discharge are ultimate fact findings. *See Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572, 580 (10th Cir.1990); *Reyes v. Hoffman,* 580 F.2d 393, 394 (10th Cir.1978). Accordingly, we are guided in our review of the district court's determinations here by the clearly erroneous standard of Fed.R.Civ.P. 52(a). A trial court's finding will be deemed clearly erroneous when, although there is some evidence to support it, upon review of the entire record the appellate court is left with the definite and firm conviction that a mistake has been made. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *see Ebert v. Lamar Truck Plaza,* 878 F.2d 338, 339 (10th Cir.1989).

### A. *Title VII*

Daemi contends that CFC harassed him, demoted him, and constructively discharged him because of his national origin in violation of Title VII.

### 1. Harassment

■ Daemi's assertions of unlawful harassment have focused on (1) Huffman's derogatory remarks to Daemi based on his national origin (*i.e.,* "damn Iranian"); (2) Vines' allegedly abusive treatment of Daemi due to his national origin, in particular, asking Daemi to take a polygraph examination and singling him out at CFC seminars for adverse treatment; and (3) Huffman and Vines' alleged directive to Daemi to terminate or otherwise eliminate CFC's Iranian employees in the Tulsa market because of their national origin.

The district court found that neither Huffman nor Vines had harassed Daemi because of his national origin.[5] The court

---

5. In its analysis, the district court relied in part on the EEOC's regulations on national origin harassment, which provide that:

Ethnic slurs and other verbal or physical conduct relating to an individual's national origin

constitute harassment when this conduct: (1) Has the purpose or effect of creating an intimidating, hostile or offensive working environment; (2) has the purpose or effect of unreasonably interfering with an individual's work

stated: "Plaintiff was not harassed in his employment; neither was plaintiff terminated. He resigned." Dist. Ct. Op., at 10. More specifically, the court found that Huffman's "discriminatory comments to plaintiff did not unreasonably interfere with his work performance nor adversely affect his employment opportunities." *Id.* at 11.

This claim of harassment because of national origin presents the most difficult question of this appeal. The conduct of Huffman in particular is troublesome because the trial judge found that Huffman told Daemi that he was a "damn Irish" or "damn Iranian" and that if he wanted to keep his job he should get rid of Iranians in his market; that Huffman openly admitted he disliked Iranians and blacks. *Id.* at 4.

Our concern about this claim is heightened because the Supreme Court's opinion in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and our opinion in *Hicks v. Gates Rubber Co.,* 833 F.2d 1406 (10th Cir.1987), were not available to the trial judge here. In particular, *Hicks* is significant in that it recognized that one of the critical inquiries in a hostile environment claim "must be the *environment.* Evidence of a general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Id.* at 1415. We held that even a woman who was never herself the object of sexual harassment might have a Title VII claim if she were forced to work in an atmosphere where such harassment was pervasive. *Id.* at 1416.

Arguably, the trial judge, not having *Hicks* before him, might not have assessed the hostility to *other* Iranians properly in his findings and conclusions as to the effect on Daemi's work environment, so that a remand would be proper. However, on review of all the findings and conclusions, we are not convinced that an error was

made or that a remand is necessary. The judge did note the specific evidence of general hostility by Huffman to Iranians as well as blacks. He found it was apparent that Huffman created conditions that caused minorities to perceive certain practices to be prejudicial and unlawfully discriminatory. Dist. Ct. Op. at 4–5. The judge then in his conclusions noted that "National origin harassment includes ethnic slurs and other verbal or physical conduct relating to an individual's national origin when the conduct has the purpose or effect of creating an intimidating, hostile or offensive working environment, has the purpose or effect of unreasonably interfering with an individual's work performance, or otherwise affects an individual's employment opportunities," citing 29 C.F.R. § 1606.8(b).

We are satisfied that the judge's findings and conclusions sufficiently show consideration of the evidence of hostility toward other Iranians with respect to Daemi's work environment. The broad test in the cited regulation contemplates such an effect. We therefore do not feel a remand is needed. The judge found that Daemi had not established a prima facie case of harassment in working conditions; that the record clearly shows Huffman's discriminatory comments did not unreasonably interfere with Daemi's work performance nor adversely affect his employment opportunities. The judge found that Vines did not unlawfully discriminate against Daemi; that his work record as an area manager was poor; and that Vines offered Daemi continued employment in a capacity in which he could succeed. These findings are not clearly erroneous.

### 2. Demotion

◼ Daemi contends that Vines' decision to demote him to store manager was the product of unlawful national origin discrimination. In addition to Vines' conduct in

performance; or (3) otherwise adversely affects an individual's employment opportunities.

29 C.F.R. § 1606.8(b). These regulations embody the so-called hostile work environment

theory of discrimination. *See generally Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (citing 29 C.F.R. § 1604.11(a)(3) relating to sexual harassment).

connection with polygraphing of Daemi and seminars, Daemi notes as proof of discriminatory intent the fact that white employees demoted around roughly the same time as Daemi were not required to undertake the allegedly onerous task of making Master Merchant within 120 days. However, the district court found that Vines demoted Daemi for reasons other than his national origin, specifically, because his "work record as an area manager was poor." Dist. Ct. Op., at 11. The court found that Daemi was a poor administrator, that he had difficulty controlling his area, and that he had communication problems with his superiors. *Id.* at 6–7.[6] Under the clearly erroneous standard, we uphold the district court's findings as to Daemi's demotion by Vines.

### 3. Constructive Discharge

▆ Daemi contends that he was constructively discharged in that CFC's demotion of him was allegedly discriminatory and subjected him to impossible performance requirements that "effectively coerced" him to resign. I R., Doc. 13, at 4. Daemi points to the special pay plan fashioned by Vines and Marlette, which established terms for his employment as store manager in store No. 827, including the allegedly onerous requirement that he make Master Merchant within 120 days.

▆ To establish a claim of constructive discharge under Title VII, employees must demonstrate that their employers' discriminatory conduct produced working conditions that a reasonable person would view as intolerable. *See Hirschfeld,* 916 F.2d at 580; *Ramsey v. City and County of Denver,* 907 F.2d 1004, 1010–11 (10th Cir.1990). *See also Irving v. Dubuque Packing Com-*

*pany,* 689 F.2d 170, 172–73 (10th Cir.1982) (discussing constructive discharge under § 1981). The district court found that Daemi was not constructively discharged by CFC but, instead, freely elected to resign. We are satisfied that this finding is not clearly erroneous. In particular, we note that we have upheld the district court's finding that Vines did not engage in any discriminatory conduct as to Daemi, and Daemi himself admitted that when he was demoted, store No. 827 (which he selected) was "ready to make master merchant." V R. 70–71; *see id.* at 76–77. Accordingly, the constructive discharge contention fails.

Thus, the trial judge's rulings on Daemi's Title VII claim are affirmed.

### B. *Section 1981*

▆ Daemi next contends that the district court erred in rejecting his discrimination claim under § 1981. Guided by the Supreme Court's decision in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), we disagree.

Section 1981 proscribes racial discrimination in the making or enforcement of employment contracts. In *Patterson,* the Court narrowly defined the scope of the right to make or enforce contracts in reaching the conclusion that a claim of racial harassment is not actionable under § 1981 because it involves conduct after the formation of the employment relationship, which is unrelated to an employee's enforcement of established contract rights through legal process. *Patterson,* 491 U.S. at 176–77, 109 S.Ct. at 2372–73; *see Trujillo v. Grand Junction Regional Center,* 928 F.2d 973, 975 (10th Cir.1991) (discriminatory discharge not actionable under

---

**6.** In a roughly contemporaneous Title VII action involving CFC's discharge of an Iranian employee, the same district court judge reached a different result. *Khaleghi v. Church's Fried Chicken,* No. 83–C–711–C (N.D.Okla. Aug. 30, 1985) (Appellant's Brief–in–Chief, Ex. A). The court found that plaintiff, a CFC store manager in Tulsa, was unlawfully discharged by CFC because of his national origin. *Khaleghi,* slip op. at 17–18. In *Khaleghi,* however, the court also found that "[p]laintiff's work record for Church's was excellent," and specifically identi-

fied plaintiff's excellent employment history with CFC as evidence of the company's discriminatory intent in effecting his discharge. *Id.* at 17, 26. In the instant case, there is no such evidence of discriminatory intent. As noted in text, the record provides ample support for the view that Daemi's work record as Tulsa area manager was poor. Therefore, to the extent that Daemi's assertion of error under Title VII is based on the different result in *Khaleghi,* it must fail; *Khaleghi* is readily distinguishable.

§ 1981). We have recently held that *Patterson* should be given retroactive effect. *Hill v. Goodyear Tire & Rubber, Inc.*, 918 F.2d 877, 880 (10th Cir.1990). Further, we specifically observed in *Hill* that *Patterson's* bar against claims of racial harassment extends to harassment claims that are founded on the existence of a hostile work environment. *Id.*

 Daemi's § 1981 claim was premised on essentially the same conduct at issue in his Title VII claim. Apparently relying on its Title VII findings against Daemi, the district court rejected Daemi's § 1981 claim without much discussion.[7] At least on the facts of this case, where Daemi consented to a bench trial of his § 1981 claim, the district court's procedure and reliance on the effect of the Title VII findings were not improper when made. *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87, 88 (8th Cir.1977); *see Whatley v. Skaggs Companies*, 707 F.2d 1129, 1139 (10th Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 314 (1983). *Cf. Lytle v. Household Manufacturing, Inc.*, 494 U.S. 545, 110 S.Ct. 1331, 1335, 1338, 108 L.Ed.2d 504 (1990) (holding that plaintiff's Seventh Amendment right to trial by jury of his § 1981 claim was infringed where collateral estoppel effect was given to the trial court's adverse findings on his Title VII claim).

However, now in light of *Patterson* and our *Trujillo* opinion, it is clear that the rejection of the § 1981 claim should be affirmed because that claim was premised solely on post-formation conduct.

## IV

### STATE–LAW CLAIMS

#### A. *Emotional Distress*

 Daemi asserts that the trial court erred in rejecting his intentional infliction of emotional distress IIED claim. We disagree.

The IIED tort (also known as the tort of outrage) is now firmly established in Oklahoma law. *Breeden v. League Services Corp.*, 575 P.2d 1374, 1376–78 (Okla.1978); *see Baker v. Weyerhaeuser Co.*, 903 F.2d 1342, 1343 n. 1 (10th Cir.1990) (applying Oklahoma law). In large measure, the Oklahoma courts have adopted the approach of the Restatement (Second) on Torts § 46(1) (1965) [hereinafter *Restatement 2d*]. Generally, to establish a prima facie case of IIED, plaintiff must demonstrate: (1) that the tortfeasor acted intentionally or recklessly; (2) that the tortfeasor's conduct was extreme and outrageous; (3) that plaintiff actually experienced emotional distress; and (4) that the emotional distress was severe. *See Pytlik v. Professional Resources Ltd.*, 887 F.2d 1371, 1379 (10th Cir.1989) (applying Okla-

---

**7.** The district court ruled that § 1981 proscribes national origin discrimination but Daemi failed to make out a prima facie case. Dist.Ct.Op., at 12. However, actually § 1981 does not outlaw national origin discrimination per se, only discrimination on the basis of race. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987); *see* M. Player, *Employment Discrimination Law* § 8.02 (1988). We are cognizant, however, that often the line between national origin discrimination claims under Title VII and racial discrimination claims under § 1981 is "not a bright one." *Saint Francis College*, 481 U.S. at 614, 107 S.Ct. at 2028 (Brennan, J., concurring).

The concept of race under § 1981 is broad. It extends to matters of ancestry which are normally associated with nationality, not race in a biological sense. *See Alizadeh v. Safeway Stores, Inc.*, 802 F.2d 111, 114–15 (5th Cir.1986) (noting that persons of Iranian descent are a protected race under § 1981, although anthro-

pologists classify them as Caucasian); *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir.1979) (noting that § 1981 is "no[t] necessarily limited to the technical or restrictive meaning of 'race'"). *See also* Player, *supra*, 834 app. C at 841. As the Supreme Court has noted, Congress intended § 1981 to "protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis College*, 481 U.S. at 613, 107 S.Ct. at 2028. As a person of Iranian descent, Daemi was protected by § 1981's bar against discrimination on the ground of race. *E.g., Alizadeh*, 802 F.2d at 114–15. His pleadings indicate that he in fact sought § 1981 relief on this ground. I R., Doc. 1, at 3; *id.*, Doc. 26, at 8. We are satisfied that, in substance, the district court's findings on Daemi's § 1981 claim dealt with the issue of discrimination in terms of race as broadly defined by the statute.

homa law); *Floyd v. Dodson,* 692 P.2d 77, 80 (Okla.Ct.App.1984). *See generally Prosser & Keeton on the Law of Torts* 59–63 (W.P. Keeton 5th ed. 1984) [hereinafter *Tort Law* ].

As a threshold matter, courts should determine whether the conduct at issue is sufficient under the extreme and outrageous standard as a matter of law. *See Breeden,* 575 P.2d at 1376–78; *Restatement 2d, supra,* § 46 comment h. That is, they should determine whether a reasonable person could find that the conduct is so offensive "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* comment d. It is clear that conduct is not extreme and outrageous if it amounts to no more than mere insults, indignities, or petty oppressions. *See Eddy v. Brown,* 715 P.2d 74, 77 (Okla. 1986). The law does not reach every case where someone's feelings are hurt. *Id.* However, conduct may be characterized as extreme and outrageous in part due to the alleged tortfeasor's abuse of a position of actual or apparent authority over the injured party. *See Breeden,* 575 P.2d at 1377; *Tort Law, supra,* at 61 (noting that conduct by such an authority figure may produce a result "something very like extortion").

Daemi contends that through its agents CFC intentionally or recklessly inflicted severe emotional distress on him by calling him derogatory names based on his national origin; compelling him to terminate, or otherwise eliminate, his Iranian subordinates because of their national origin; impugning his integrity by accusing him of criminal acts, and requiring him to take a polygraph; and, lastly, subjecting him to ridicule and other abusive treatment at CFC seminars. The district court found, however, that Daemi had failed to establish the elements of his IIED claim by a preponderance of the evidence, correctly observing that mere insults and the like are not actionable under the IIED tort. We hold that these findings on Daemi's IIED claim are supported by the record.[8]

■ A serious question under the extreme and outrageous standard is raised by Daemi's assertions as to CFC's alleged national origin discrimination. However, even assuming that the alleged discriminatory practices satisfy this standard,[9] we

8. We feel that many assertions by Daemi as to CFC's alleged conduct are legally inadequate under the narrow standard of extreme and outrageous conduct. Specifically, we refer to Daemi's assertions that CFC impugned his integrity, demoted him, and mistreated him at seminars. In the context of IIED claims, Oklahoma courts have allowed employers some latitude in investigating possible employee misconduct. *See Haynes v. South Community Hosp. Mgmt., Inc.,* 793 P.2d 303, 307 (Okla.Ct.App.1990). *Accord Sterling v. Upjohn Healthcare Services, Inc.,* 299 Ark. 278, 772 S.W.2d 329, 330 (1989) (noting, in the context of an IIED claim, that "an employer must be given a certain amount of latitude in dealing with employees"). Like some other jurisdictions, it seems reasonable to conclude that Oklahoma would not ordinarily deem the polygraphing of an employee under investigation to be extreme and outrageous conduct. *See id.* 772 S.W.2d at 330; *Food Fair, Inc. v. Anderson,* 382 So.2d 150, 152–53 (Fla.Ct.App.1980).

Further, the act of demoting an employee appears to be precisely the kind of petty oppression that the IIED tort does not redress. *See Kirwin v. New York State Office of Mental Health,* 665 F.Supp. 1034, 1040 (E.D.N.Y.1987) (applying New York law); *Schoen v. Consumers United Group, Inc.,* 670 F.Supp. 367, 379 (D.D.C.

1986) (applying District of Columbia law). Lastly, at best, the conduct of Vines towards Daemi at CFC seminars amounts to "no more than ordinary rudeness," and accordingly does not satisfy the extreme and outrageous standard. *Snider v. Circle K,* 923 F.2d 1404, 1409 (10th Cir.1991) (applying Oklahoma law).

9. This assumption would seemingly hold true at least as to Daemi's allegation that CFC management directed him to eliminate his countrymen because of their national origin. To be sure, not all conduct animated by a discriminatory intent rises to the level of extreme and outrageous. *See Martin v. Citibank, N.A.,* 762 F.2d 212, 220 (2d Cir.1985) (applying New York law) (where employees were allegedly singled out for polygraphing because of their race); Restatement (Second) on Torts § 46 comment d (1965) (noting that proof that defendant acted with "an intent which is tortious or even criminal" is not sufficient to establish that defendant's conduct was extreme and outrageous). Yet it seems likely that reasonable persons could disagree here as to whether the extreme and outrageous standard was met in view of (1) the element of unadorned discrimination reflected in the conduct of Daemi's supervisor Huffman, and (2) the inherently offensive nature of the directive

conclude that Daemi's IIED claim fails because there was insufficient evidence to support the view that the emotional distress experienced by Daemi was severe. "[I]n order to prevent the tort of outrage from becoming a panacea for all of life's ills, recovery must be limited to distress that is severe." *U.S.A. Oil v. Smith*, 415 So.2d 1098, 1101 (Ala.Civ.App.), *writ denied*, 415 So.2d 1102 (Ala.1982); *see Butler v. Westinghouse Elec. Corp.*, 690 F.Supp. 424, 430 (D.Md.1987) (applying Maryland law) (rejecting claim of severe emotional distress, where the evidence indicated that due to his employer's racially discriminatory conduct plaintiff was nervous and anxious and experienced headaches). In other words, the distress must be of such a character that "no reasonable person could be expected to endure it." *Restatement 2d, supra*, § 46 comment j. Such distress is often accompanied by "shock, illness, or other bodily harm," but bodily harm is not a prerequisite for demonstrating severe emotional distress. *Id.* comment k.

Daemi testified that during his employment as Tulsa area manager the allegedly discriminatory treatment he received from CFC caused him distress and made him literally sick to his stomach. II R. 41, 43. Daemi apparently visited the doctor on at least one occasion seeking treatment for his stomach,[10] and may have discussed CFC's allegedly discriminatory conduct with a therapist he was consulting for marital difficulties. *Id.* at 81, 82–84. Daemi's brother-in-law, Steve Morgan, testified that after Daemi resigned from CFC his behavior changed: he would not "cut up and joke anymore"; he was insecure, "very nervous, [and] unrestful." III R. 28–29.

We find Daemi's evidence as to the severity of his emotional distress to be legally insufficient—that is, it is not of a character such that "no reasonable person could be expected to endure it." *Restatement 2d, supra*, § 46 comment j. Thus we conclude that Daemi's evidence on this point is legally insufficient under Oklahoma law. The trial court accordingly did not err in ruling that Daemi failed to make out his IIED claim.

## B. Breach of Contract

Daemi also contends that the district court erred in rejecting his breach of contract claim. Again, we must disagree.

At trial, Daemi argued that CFC made representations in its employee manuals and handbooks, and in particular its Field Operations Manual (FOM), that limited its power to demote him at will.[11] Daemi argued that through its manuals and handbooks CFC promised Daemi that he would not be demoted except for cause. Also, the manuals and handbooks allegedly contained representations by CFC that the procedures outlined therein touching on demotions would be uniformly adhered to. By virtue of these representations, CFC allegedly entered into a contract with Daemi, and it breached this contract in demoting him, thereby effecting his constructive discharge.

In a significant number of jurisdictions, employers are subject to liability on a contract theory for disregarding representations in their employee manuals and handbooks specifying that certain actions, including disciplinary actions, will only be taken for cause or in accordance with particular procedures. *See, e.g., Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880, 885, 891–92 (1980); H.

---

that, in effect, forced Daemi to betray his countrymen. However, because we conclude below that Daemi's evidence was legally insufficient to establish that his distress was severe, we need not resolve this threshold question definitively.

**10.** Sharon Austin, a friend of Daemi, testified that while in Tulsa Daemi experienced trouble with, and sought medical treatment for, his stomach. II R. 142–43, 146. She noted that Daemi complained that his superiors at CFC were prejudiced. However, she attributed Daemi's poor physical condition to job-related stress, not discriminatory treatment per se. *Id.* at 142.

**11.** Daemi does not dispute that, absent representations from CFC to the contrary which could form the basis of a contract, his employment with CFC was essentially employment at will. That is, he could be discharged by CFC for poor reasons or for no reasons at all. *E.g., Singh v. Cities Service Oil Co.*, 554 P.2d 1367, 1369 (Okla. 1976).

Perritt, *Employee Dismissal Law and Practice* §§ 4.1, 4.7 (1984). The parameters of Oklahoma contract law in this area, however, are not clearly defined. The Oklahoma courts have indicated that employer representations in manuals and handbooks may form the basis for actionable contracts under certain circumstances. *See Hinson v. Cameron*, 742 P.2d 549, 554–55 (Okla.1987); *Langdon v. Saga Corp.*, 569 P.2d 524, 527–28 (Okla.Ct.App. 1976). *Accord Carnes v. Parker*, 922 F.2d 1506, 1510 (10th Cir.1991) (construing Oklahoma law); *Vinyard v. King*, 728 F.2d 428, 432 (10th Cir.1984) (construing Oklahoma law). We recently sought to delineate these circumstances in our *Carnes* decision.

Construing Oklahoma law, we held in *Carnes* that employer representations in employee manuals and handbooks could only be deemed to have altered the at-will employment relationship to the extent that they provide for such alteration in express terms. *Carnes*, 922 F.2d at 1510–11; *see Breshears v. Moore*, 792 P.2d 91, 93 (Okla. Ct.App.1990). We thus declined to imply a for-cause requirement as to discharge from a nonexclusive list of grounds for discharge, and an employer representation that administrators *"may* carry out disciplinary action towards an employee for just cause." *Carnes*, 922 F.2d at 1508, 1511 (emphasis added). We observed that the employer manual did not "expressly state discharge is allowed only for cause," and concluded that under Oklahoma law we were bound to "consider the express terms of an employment policy contained in a personnel manual—nothing more, nothing less." *Id.* at 1511.

In rejecting Daemi's contract claim, the district court found that CFC's employee manuals and handbooks gave rise to an agreement between the parties, but CFC was not liable because there was no showing that it breached the agreement. The district court reached the correct result in rejecting Daemi's contract claim and, accordingly, we affirm.

If the CFC–Daemi agreement can be read as establishing a for-cause requirement, CFC's conduct did not effect a breach. There was ample evidence that Daemi was a poor area manager in Tulsa. Accordingly, CFC could have reasonably concluded that there was cause to demote him. From our examination of the manuals and handbooks (including the provisions cited by Daemi),[12] moreover, we discern no CFC promises as to procedures that could reasonably be deemed actionable relative to Daemi's demotion to store manager. For example, Daemi directs our attention to FOM No. 17.185, which provides that all CFC employees should be evaluated in writing at least once a year. It is undisputed that Daemi was not evaluated in writing during the roughly 13 months he served as an area manager in the Tulsa market. However, the nexus between any breach of this FOM provision and Daemi's demotion is attenuated at best. The FOM does not provide that such evaluations are a condition precedent to demotions. *Cf. Breshears*, 792 P.2d at 92 (where "[t]he policies and procedures expressly created a duty on the part of the employer to do certain things before discharging someone"). Vines, moreover, orally counseled Daemi on several occasions regarding his performance deficiencies prior to demoting him.

Accordingly, we do not perceive CFC's purported promise embodied in FOM No. 17.185 to be actionable in the context of Daemi's demotion.[13] The district court did not err in rejecting Daemi's contract claim.

---

**12.** We note that certain materials cited by Daemi in the CFC manuals and handbooks (not including FOM No. 17.185 discussed in text) were apparently issued *after* Daemi's demotion and resignation. There seems to be no dispute, however, that the substance of these materials was in force during the period of Daemi's employment with CFC. Daemi proffered the manuals and handbooks for admission into evidence and CFC did not object. Accordingly, in considering the merits of Daemi's breach of contract claim, we have thoroughly reviewed all of the materials cited by Daemi.

**13.** Daemi also directs us to statements in the job description of CFC district managers like Vines, which specify that district managers should conduct "periodic evaluations" of area managers, and should "privately" review the work of area managers who report to them each quarter.

### C. *Wrongful Discharge*

With limited support in Oklahoma case law, Daemi advanced the argument before the district court that he was entitled to relief in tort based on his purported constructive discharge. During the pendency of this appeal, however, the Oklahoma Supreme Court made clear that an action in tort does lie "in a narrow class of cases in which the discharge is contrary to a clear mandate of public policy as articulated by constitutional, statutory or decisional law." *Burk v. K–Mart Corp.,* 770 P.2d 24, 28 (Okla.1989).

Generally, under *Burk* employees must demonstrate that they were discharged for refusing to engage in conduct that contravenes an established, well-defined public policy, or for engaging in conduct that is consistent with such a public policy. *Id.* at 29; *see Vannerson v. Board of Regents,* 784 P.2d 1053, 1055–56 (Okla.1989) (where employee allegedly discharged for reporting the misappropriation of government property). Daemi argues on appeal that his discharge is actionable in tort under *Burk* because it was motivated by national origin or race-based animosity, which is contrary to the anti-discrimination mandate of federal statutes like Title VII.

However, irrespective of whether Daemi's wrongful discharge allegations are sufficient to state a claim under *Burk,*[14] we conclude that the district court's general finding of fact as to Daemi's purported discharge determines the matter against him. The court expressly found that Daemi was not discharged at all, constructively or otherwise; instead, he elected to resign.

We have already held that this finding is not clearly erroneous. Accordingly, Daemi's wrongful discharge action must fail, as there is no factual basis to support it (*i.e.,* no discharge). We therefore sustain the district court's ruling on Daemi's wrongful discharge claim.

AFFIRMED.

---

Plaintiff's Trial Ex. 10, at 2, 3 (I Second Supp. R.). Assuming *arguendo* that such representations in a job description of Daemi's supervisor could form the basis of a contract that Daemi could enforce on his own behalf, we question whether Vines' conduct (including several instances of informal counseling of Daemi) establishes a tenable basis here for an assertion of breach. In any event, for the reasons noted as to FOM No. 17.185, we conclude that any CFC breach of its purported promises as to area manager evaluations embodied in the district manager job description cannot be deemed actionable in the context of Daemi's demotion.

**14.** We note in this regard that some courts have ruled that the mere availability of Title VII's detailed remedial scheme bars state-law wrongful discharge claims, where the public policy at issue in such claims (*e.g.,* a policy against national origin discrimination by employers) tracks the anti-discrimination policy of Title VII. *See Lapinad v. Pacific Oldsmobile–GMC, Inc.,* 679 F.Supp. 991, 993–94 (D.Haw.1988) (construing Hawaii law); *Salazar v. Furr's Inc.,* 629 F.Supp. 1403, 1408–09 (D.N.M.1986) (construing New Mexico law). The Oklahoma Supreme Court has not spoken on this issue of Title VII preclusion. In view of our disposition of Daemi's wrongful discharge claim, we need not reach this question of first impression here.