962 F.2d 17
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Wanda Linda O'LEARY, Plaintiff-Appellee,
v.
OKLAHOMA DEPARTMENT OF HUMAN SERVICES, Defendant-Appellant,
and
The Delaware County Department of Human Services; Winston
Dunaway; Pat Weaver; State of Oklahoma Public
Welfare Commission, doing business as
Department of Public Welfare,
Defendants.
 No. 91-5049.
 United States Court of Appeals, Tenth Circuit.
 April 28, 1992.
 
 Before EBEL and BARRETT, Circuit Judges, and KANE,* Senior District Judge.
 ORDER AND JUDGMENT**
 EBEL, Circuit Judge.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 2
 Plaintiff commenced an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, alleging sexual harassment and retaliation based on her filing of complaints of sexual harassment. After a bench trial, the district court permitted Plaintiff to amend her complaint to conform to the evidence presented at trial to include a constructive discharge claim. The district court entered Findings of Fact and Conclusions of Law in favor of Plaintiff. In its judgment, the court awarded front pay and back pay of $51,418.22 plus pre- and post-judgment interest. Defendant Oklahoma Department of Human Services appeals from the judgment, arguing (1) the district court erred in finding that Plaintiff was retaliated against due to her complaints filed with the Equal Employment Opportunity Commission (EEOC) and Oklahoma Human Rights Commission (OHRC); (2) the district court erred in finding a hostile work environment and retaliation based on gender; and (3) the district court erred in concluding Plaintiff was constructively discharged. We affirm.
 
 
 3
 Plaintiff began working for Defendant on August 23, 1971, as a social worker. Appellant's Add. ex. 1. On October 16, 1975, she transferred to the Division of Social Services, id. ex. 2, where her immediate supervisor was Pat Weaver, Appellant's App.Vol. II, pt. A at 97, who was supervised by Winston Dunaway, the County Administrator, id. Vol. II, pt. C at 441. Plaintiff worked for the Division of Social Services until December 16, 1977, when she transferred to the Court Related and Community Services Unit, which was in the county office building and where she was not under any supervision by Dunaway. Appellant's Add. ex. 4; Appellant's App.Vol. II, pt. A at 102.
 
 
 4
 During the time she was under the supervision of Dunaway, Plaintiff testified that she was sexually harassed by Dunaway. On a trip to the field with Dunaway, Plaintiff testified that he requested they stop at her house where he grabbed and kissed her and suggested going to bed. Appellant's App.Vol. II, pt. A at 95-99. Also, he "played" with her leg while she was driving.
 
 
 5
 Additionally, during the 1970's Plaintiff and other witnesses testified that they had witnessed Dunaway's sexual advances toward other female employees. Plaintiff and Barbara Chastain observed him with his hand down the blouse of one of the secretaries, fondling her breasts. Id. at 37, 100. Chastain also observed this type of conduct on another occasion. Although she did not observe other physical conduct, Chastain believed Dunaway's physical contacts were common knowledge. Id. at 38. She stated that when workers did not do as Dunaway wanted, he made things difficult for them. Id. While on a business trip with Dunaway, he took Chastain and others to a topless bar during working hours. Id. at 43. During this time period, Dunaway admitted keeping pornographic magazines in his office and had a picture of a nude woman hanging in his bathroom.[1] Appellant's App.Vol. II, pt. C at 476-77.
 
 
 6
 As part of an administrative reorganization, the Court Related and Community Services Unit relocated from the courthouse annex to the county office building on December 16, 1986. Appellant's App.Vol. II, pt. B at 260-61. At that time, Plaintiff again was under the control and supervision of Dunaway. Appellant's App.Vol. II, pt. A at 102.
 
 
 7
 Subsequent to her transfer, Plaintiff testified that on one occasion when she had failed to sign in, Dunaway slammed a clipboard into her chest and separated her breasts. Id. at 108. She observed him doing head-to-head touching of female employees, side-by-side rubbing, and putting his arms around female staff and squeezing them. Id. at 109.
 
 
 8
 Other witnesses also testified as to Dunaway's sexual advances during this time period. Jonetta Spyres testified that during her employment interview Dunaway stared at her breasts and did not look her in the eye. Id. at 48. She also observed other instances of sexual harassment. Id. at 56, 61. Linda Brumbaugh testified that she saw Dunaway rub female employees, hug them, and kiss them on the cheek. Id. at 79-80.
 
 
 9
 On August 12, 1987, Plaintiff filed a complaint with the OHRC contending that she was being sexually harassed. Appellant's Add. ex. 22. Plaintiff stated in the complaint that Dunaway acted in a hostile manner, called her names, threatened her with suspension or termination, unfairly reprimanded her, and glared at her. She believed Dunaway harassed her in retaliation for her rejection of his sexual advances. On August 24, 1987, Plaintiff filed a charge of sexual discrimination with the EEOC. Id. ex. 12.
 
 
 10
 After Plaintiff filed the complaints, Dunaway changed her working hours and assigned her extra duties. Appellant's App.Vol. II, pt. A at 118-19. Also, he started watching and following her and monitoring her telephone calls, and he directed other employees to watch her. Id. at 68-70, 84, 86, 122-23, 196. Many employees would not associate with Plaintiff, because they could not be friends with both Plaintiff and Dunaway. Id. at 49-52, 68. Linda Bingham testified that the office environment changed after Plaintiff filed her sexual discrimination complaint. Id. at 195. Locks were placed on supervisors' doors, the outside door locks were changed, and a telephone was removed from an interview room. Id. at 195-96. Bingham further testified that there was a general atmosphere of intimidation and people were afraid of associating with Plaintiff. Id. at 196. She attributed the office atmosphere to Dunaway. Id. Additionally, there was evidence that after Plaintiff filed her complaints her leave time was monitored. Appellant's App.Vol. II, pt. B at 417 and pt. C at 493-94.
 
 
 11
 On April 19, 1989, the OHRC dismissed Plaintiff's complaint, finding no evidence of sexual harassment after Plaintiff's retransfer to the State office building in 1986. Appellant's Add. ex. 30. On May 12, 1989, the EEOC, giving substantial weight to the findings of the OHRC, determined that Plaintiff did not establish violations of Title VII. Id. ex. 31.
 
 
 12
 On April 19, 1989, Plaintiff filed a grievance alleging that Wahleah Jordan was making faces at her and that Jordan and Dunaway on one occasion had directed distorted faces and high pitched laughter at her. Id. ex. 32. On April 24, 1989, Plaintiff filed a grievance alleging discrimination and improper denial of a promotion. Id. ex. 38.
 
 
 13
 On January 3, 1989, Plaintiff began receiving treatment from Dr. John Gastorf, a licensed psychologist, for anxiety and depression due to job stress. Appellant's App. Vol. II, pt. A at 16-17. Dr. Gastorf wrote a letter on July 10, 1989, recommending that Plaintiff be given a leave of absence due to a decreased level of functioning due to job stress. Id. at 19-20, 24-25. It was his opinion that she should either transfer or not return to work. Id. at 24.
 
 
 14
 In July, 1989, Plaintiff was granted approval for leave without pay and remained on leave for one year. Id. at 186. At the end of the year, she requested additional leave, which was denied with notice that failure to return would result in her termination. Id. at 186-87. When she did not return, Plaintiff was terminated. Id. at 185, 193-94. She appealed the termination. The appeal was denied.
 
 
 15
 On December 15, 1988, plaintiff commenced this action in the district court. After a bench trial, the court found that Defendant had discriminated against, retaliated against, and constructively discharged Plaintiff. Defendant appealed.
 
 RETALIATION
 
 16
 Defendant argues that the district court's finding that Plaintiff was retaliated against because of her complaints with the EEOC and OHRC is clearly erroneous. A finding of retaliation is a fact question reviewed under the clearly erroneous standard. Love v. RE/MAX of Am., Inc., 738 F.2d 383, 386 (10th Cir.1984). A finding is clearly erroneous when the reviewing court, after reviewing all the evidence, is left with a firm conviction that a mistake has been made. Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574. Due regard is given to the district court's opportunity to judge the credibility of the witnesses. Ebert v. Lamar Truck Plaza, 878 F.2d 338, 338 (10th Cir.1989).
 
 
 17
 After reviewing the record, we are convinced the district court's finding of retaliation is not clearly erroneous. The district court found that before Plaintiff filed her complaints, Dunaway stared at Plaintiff while she was working, directed other employees to watch her, had her telephone removed, and changed her working hours. Also, the court found that other employees became less friendly to Plaintiff. The district court determined that after she filed her complaints these practices persisted, many employees would not associate with Plaintiff, and false accusations of not following up with clients and attempting to run employees off the road were made. Although the district court's findings are not clearly erroneous, we note that some of the things the district court believed occurred before Plaintiff filed her complaint actually occurred after she filed her complaint. The evidence in support of retaliation was stronger than the district court found.
 
 HOSTILE WORK ENVIRONMENT
 
 18
 Defendant argues that the district court's finding of a hostile working environment and retaliation based on sex is clearly erroneous. The existence of a hostile work environment is a fact question reviewed pursuant to the clearly erroneous standard. Hicks v. Gates Rubber Co., 928 F.2d 966, 971 (10th Cir.1991).
 
 
 19
 Hostile work environment sexual harassment occurs when conduct unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " Id. at 67 (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982)). "Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances." Hicks v. Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir.1987).
 
 
 20
 The district court found that there was an atmosphere of intimidation for female employees who rejected Dunaway's advances and favoritism toward other female employees. We conclude the record fully supports the district court's findings and conclusion of hostile work environment sexual harassment.
 
 CONSTRUCTIVE DISCHARGE
 
 21
 Defendant argues that the district court's finding that Plaintiff was constructively discharged is clearly erroneous. Defendant believes the circumstances existing prior to Plaintiff's separation were not such as would be viewed by a reasonable person as intolerable.
 
 
 22
 Constructive discharge also is a fact question, which is reviewed under the clearly erroneous standard. Daemi v. Church's Fried Chicken, Inc., 931 F.2d 1379, 1384 (10th Cir.1991); Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 580 (10th Cir.1990). "Plaintiff bears the burden of proving she was constructively discharged by a preponderance of credible evidence; mere uncontroverted evidence, if not credible, is insufficient." Hirschfeld, 916 F.2d at 580. "The test for a constructive discharge claim brought under Title VII is 'whether a reasonable person would view the working conditions as intolerable.' " Id. (quoting Derr v. Gulf Oil Corp., 796 F.2d 340, 343 (10th Cir.1986) (quotations, brackets, and footnote omitted)).
 
 
 23
 The district court, applying the above standard, determined Plaintiff's termination following a medical leave was tantamount to a constructive discharge. Although there is thin evidence to establish an intolerable environment, we conclude there is enough evidence to support the district court's finding. Although a reasonable person perhaps could have tolerated the conditions in the workplace, Plaintiff alleged that additional things happened to her that did not happen to other female employees. Thus, we conclude the district court's findings were not clearly erroneous.
 
 
 24
 The judgment of the United States District Court for the Northern District of Oklahoma is AFFIRMED.
 
 
 
 *
 Honorable John L. Kane, Jr., Senior District Judge, United States District Court for the District of Colorado, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 There was also evidence of sexual advances during the time Plaintiff was not under Dunaway's supervision. Plaintiff testified that at a work function in the early 1980's Dunaway invited her to sit by him, touched her leg, rubbed against her shoulders, looked at her longingly, and ogled her breasts. Appellant's App. Vol. I, pt. A at 105-06. When she was pregnant in 1986, he told her how attractive she looked pregnant and ogled her breasts. Id. at 104-05