UNITED STATES of America, Plaintiff–Appellee,

v.

Leonard SCHULTZ, Defendant–Appellant.

No. 87–1394.

United States Court of Appeals, Sixth Circuit.

Argued June 13, 1988.

Decided Sept. 1, 1988.

William VanDercreek (argued), Dallas, Tex., for defendant-appellant.

Frank J. Marine (argued), Sp. Counsel to Chief Organized Crime & Racketeering, Criminal Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before LIVELY and JONES, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

Defendant Leonard Schultz appeals his jury convictions for conspiracy to possess with intent to distribute and to distribute cocaine (21 U.S.C. § 846), unlawful use of a communications facility (21 U.S.C. § 843(b)), and interstate travel in aid of racketeering (18 U.S.C. § 1952). Schultz argues that there is not sufficient evidence to sustain a conviction of conspiracy and that his travel, purely coincidental to the drug deal negotiations, did not violate the Travel Act. Schultz also contends that the trial court erred in refusing his request to subpoena FBI records, in refusing to give a jury instruction on Schultz's defense theory, in admitting certain government testimony linking him to organized crime, and in admitting evidence regarding an allegedly unrelated cocaine deal of Schultz's co-conspirator. Finally, Schultz argues that the trial court failed to comply with the sentencing requirements of Federal Rule of Criminal Procedure 32, and that the judge fined Schultz consecutively in the written order after fining him concurrently in the oral sentence from the bench. We determine that none of these arguments is meritorious, and accordingly AFFIRM the convictions.

## I

Schultz was charged, tried, and found guilty on all three counts of a three count indictment. Count Two, unlawful use of a communication facility (telephone), and Count Three, interstate travel in aid of racketeering, were premised on the underlying conspiracy to distribute cocaine of Count One. Defendant was sentenced to a total of five years imprisonment on all three counts and fined $250,000 on Count One and $250,000 on Count Two.

Schultz had been a confidential informer for the FBI for over thirty years but none of the information he supplied regarded drug transactions. His defense was that he was "setting up" his alleged coconspirators and conducting his own investigations. Schultz has a permanent residence in De-

troit, Michigan, and a condominium in North Miami Beach, Florida. The government offered evidence to show that from December 1984 to March 1985, Schultz conspired with Alan Nadell and with Sam Einhorn to distribute ten kilograms of cocaine. Nadell was arrested in March 1985, when he delivered one-half kilogram of cocaine to undercover Michigan State Police Officer James Tuttle. Nadell then became a government informer and witness at the trial. Also testifying were two FBI agents, as well as Einhorn, Tuttle, and Jeffrey Sand, a paid police informer.

In December 1984, Nadell and Schultz discussed distributing drugs for profit. Schultz also asked Einhorn, who lived in Detroit, to help sell cocaine and find buyers. Einhorn agreed. In early January, Einhorn asked Sand if he wanted to buy cocaine from a Florida contact. Einhorn arranged a meeting between himself, Sand, and Schultz in Detroit. Schultz agreed to sell Sand ten kilograms at $40,000 a kilo. Schultz would act as intermediary and obtain the cocaine from a source in Florida.

Schultz then contacted Nadell and asked him to obtain cocaine for some people in Detroit. Nadell agreed and contacted his drug source. Splitting of the profits from the deal was never discussed, but Nadell testified that he intended to split the profits 50/50 with Schultz.

Sand informed police of the deal and subsequent contacts, in person and over the telephone, were tape-recorded. In a January 17, 1985 conversation, Sand told Einhorn that he had the money for the cocaine and Einhorn agreed to arrange a meeting. Two days later, the two met with Schultz. Sand told Schultz that he had the money and was willing to drive to Florida to get the drugs, but that he first wanted a sample. Schultz suggested that the money be put in a safe deposit box and that his Florida contact would arrange the deal. From January 21 to January 31, 1985, Sand and Schultz discussed the deal over the phone. Schultz suggested a partial delivery since his contact was still trying to get the ten kilos. Sand told Schultz that the money was already in Florida and that he

and his partner planned to go there in early February.

On February 5, Schultz told Sand that he was leaving for Florida on the 8th and told Sand to go to Florida. After arriving in Florida, Schultz spoke to Sand, still in Michigan, on the 12th and told him that his contact had the "ten acres" but that he wanted "42" ($42,000 per kilo rather than $40,000). Sand agreed to bring an additional $20,000. The next day Sand agreed to meet Schultz and Nadell on the 14th in Florida.

Sand and Tuttle flew to Miami on the 14th and met with Nadell. They agreed to meet the next day to discuss the arrangements for the deal. The following morning, Nadell told Sand and Tuttle that his people wanted to sell one kilo at a time with the money fronted. Tuttle would not accept the arrangement. Nadell informed Schultz of these meetings and told him he was having trouble getting all ten kilos.

On February 15, Schultz and Nadell spoke by telephone with Sand. Schultz explained that the piecemeal deal was to protect Sand and create trust. Sand responded that he had to talk with Tuttle. An hour later, Schultz and Nadell called Tuttle, who complained about the piecemeal deliveries. Schultz explained that he established that arrangement because it was their first deal. Tuttle said he would have to return to Michigan unless he received all ten kilos. Schultz and Tuttle agreed to try to work something out. Schultz told Nadell to make the arrangements and Nadell agreed to call Tuttle in Michigan.

The next day Tuttle and Sand returned to Michigan. Tuttle and Nadell spoke by telephone until March 22, 1985, in an attempt to complete the sale. During this time, Nadell had three or four telephone conversations with Schultz, who had returned to Michigan. Nadell asked Schultz to check out Tuttle. Schultz later informed Nadell that the telephone number that Tuttle had given Schultz was a workable number. Nadell called Schultz and told him that he might go to Michigan to complete the deal with Tuttle, and Schultz replied that if Na-

dell ever came to Michigan, Schultz could see that he was protected.

After numerous phone conversations between Nadell and Tuttle, the latter agreed to buy one-half kilo of cocaine to be delivered in Michigan. On March 22, 1985, Nadell did fly to Detroit, gave Tuttle the one-half kilo of cocaine in exchange for $25,000, and was arrested.

Although Nadell did not tell Schultz he was going to Michigan to sell cocaine to Tuttle and Schultz did not know that he was there, Nadell testified that he intended to split the profit from this sale with Schultz. Shortly after learning of the arrest, Schultz asked Einhorn if Sand was an informant. Schultz told Einhorn that if questioned by the FBI, he should tell "the truth" that Schultz was trying to "clean up the condo complex" to rid it of drug dealers.

The jury found Schultz guilty on all three counts. Schultz's motion for a judgment of acquittal was denied. The judge sentenced Schultz to a term of five years and a $250,000 fine on Count One, four years concurrent with Count One and a $250,000 fine on Count Two, and five years concurrent with Counts One and Two on Count Three.

## II

*Sufficient evidence for conspiracy*

In reviewing a denial of a motion for judgment of acquittal, we must view the evidence and inferences drawn therefrom in the light most favorable to the government. Witness credibility is solely within the province of the jury. *United States v. Pelfrey,* 822 F.2d 628, 632 (6th Cir.1987). To sustain the jury's verdict, the evidence does not need to be inconsistent with every conclusion save that of guilt. *United States v. Nelson,* 419 F.2d 1237, 1242–43 (9th Cir.1969). We must affirm a conviction if any rational trier of fact could have found defendant guilty beyond a reasonable doubt. *United States v. Bourjaily,* 781 F.2d 539, 544 (6th Cir.1986), *aff'd,* ——— U.S. ———, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

The nature of the agreement comprising a conspiracy can be inferred from circumstantial evidence. *United States v. Butler,* 618 F.2d 411, 414 (6th Cir.), *cert. denied,* 447 U.S. 927, 100 S.Ct. 3024, 65 L.Ed.2d 1121 (1980). "Drug distribution conspiracies are often 'chain' conspiracies such that agreement can be inferred from the interdependence of the enterprise." *Bourjaily,* 781 F.2d at 544. It is not necessary to prove that the defendant was aware of each act of his coconspirators in furtherance of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946).

Schultz argues that a conspiracy did not exist because he only participated in preliminary negotiations concerning the deal and did not agree to the details of the sale. The testimony showed that in December 1984, Einhorn had agreed to help Schultz sell cocaine by finding prospective buyers, and that by January, the two were meeting with Sand to arrange a sale of ten kilos. At the same time, Nadell agreed to get ten kilos of cocaine from his Florida drug source for Schultz to sell to persons in Michigan at $40,000 per kilo. Therefore, by January 1985, a conspiratorial agreement between Schultz, Einhorn, and Nadell had been reached regarding the quantity, price, and source of the drug. In addition, they understood what each of their roles was to be in the deal. *See United States v. Anello,* 765 F.2d 253, 262–63 (1st Cir.), *cert. denied,* 474 U.S. 996, 106 S.Ct. 411, 88 L.Ed.2d 361 (1985) (sufficient evidence to support conspiracy when defendant "at least agreed *conditionally* to 'purchase the marijuana with an intent to distribute it'— i.e., he agreed to buy *if* the quality was adequate. But agreement to buy that is conditional is nonetheless for conspiracy purposes an agreement to buy...."); *United States v. Elledge,* 723 F.2d 864, 868 (11th Cir.1984) ("A complete detailed agreement is not necessary to convict persons of conspiracy."). Moreover, failure to complete the sale of the full ten kilos because of disagreements between Schultz and Tuttle over whether it would be delivered in one shipment or in several does not preclude the existence of an agreement.

Furthermore, conviction of conspiracy under 21 U.S.C. section 846 does not require proof of an overt act. *United States v. Dempsey*, 733 F.2d 392, 394–96 (6th Cir.), *cert. denied*, 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984).

Schultz also contends that his participation ended before the deal was consummated, and that Nadell's sale to Tuttle was a completely separate deal in which Nadell was acting independently. Schultz argues that Nadell's actions between February 16 and March 22, 1985, culminating in the delivery of the half kilo to Tuttle, were independent acts of Nadell and did not involve Schultz. " 'Whether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury ... and [is] to be considered on appeal in the light most favorable to the government.' " *United States v. Kelley*, 849 F.2d 999, 1002 (6th Cir.1988) (quoting *United States v. Grunsfeld*, 558 F.2d 1231, 1238 (6th Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 219, 54 L.Ed.2d 152 and *cert. denied*, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1977)). The jury could infer, based on the evidence, that Nadell's acts were in furtherance of the conspiracy in which Schultz was involved and the trial court instructed the jury as to both single and multiple conspiracies. Therefore, we find sufficient evidence to establish a single conspiracy and accordingly affirm the conspiracy conviction.

### Conviction under the Travel Act

Schultz argues that the evidence did not show a violation of the Travel Act as a matter of law or fact, and therefore his conviction under Count Three should be reversed. Under the Travel Act, the government must establish that the defendant traveled in interstate commerce with the intent to commit an unlawful act while so traveling and did attempt or commit the act. *United States v. Finazzo*, 704 F.2d 300, 307 (6th Cir.), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983). Schultz makes much of the fact that he is an elderly man (70 years old) whose part-time labor relations business in Detroit allows him to split his time between his home there and his condo in Florida. His travel agent testified that Schultz regularly traveled between the two places between 1983 and 1985, and that the trip in February 1985 was booked before any of the alleged illegal activity and took place exactly as previously planned. Schultz argues that there was no business enterprise or continuous course of conduct as required under the statute, but only sporadic, casual involvement by him. Moreover, even if a business enterprise could be established, he argues that his travel was not related to the enterprise.

Promotion of the unlawful activity, however, need not be the sole or dominant purpose of the interstate travel. *United States v. Walsh*, 700 F.2d 846, 854 (2d Cir.), *cert. denied*, 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983). Furthermore, the interstate travel need not be essential to the illegal activity, or an integral part of it. *United States v. Eisner*, 533 F.2d 987, 991 (6th Cir.), *cert. denied*, 429 U.S. 919, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976) (any use of interstate facility sufficient). The evidence showed that Schultz told Sand on February 5 to meet him in Florida to complete the deal. Schultz then flew to Florida on the 8th and discussed the deal with Sand on February 12 and 13. On the 14th, Tuttle and Sand flew to Florida and on the 15th Schultz and Nadell had several discussions regarding the deal. Therefore, there was sufficient evidence to show that one of Schultz's purposes in traveling to Florida was to complete the delivery of the cocaine. Moreover, the evidence shows that the unlawful activity was part of a continuing course of conduct.

### Subpoena of FBI records

Schultz argues that his sixth amendment right to compulsory process was violated when the district court quashed his subpoena duces tecum for FBI 302 forms detailing his involvement from 1951 to 1985 as an informant for the FBI. The court stated that it found "absolutely nothing in these files of substance that would bear upon anything at all, even remotely connected with this case." Schultz contends

that these materials related to his defense of aiding the FBI and would rebut a government witness's remarks linking Schultz to organized crime. Furthermore, Schultz argues that the trial court abused its discretion when, after conducting an *in camera* review of the documents, it failed to preserve them under seal for appellate review.

The test for the production of government documents is found in *United States v. Nixon*, 418 U.S. 683, 699–700, 94 S.Ct. 3090, 3103–04, 41 L.Ed.2d 1039 (1974), and requires that the moving party show that the requested documents are evidentiary and relevant, cannot otherwise be obtained, are necessary for proper trial preparation, and that the request is made in good faith.

The government argues that the documents were not relevant to this case because, as established by the testimony of an FBI agent, Schultz did not provide any informant information about this case and he had never served as an informant in a narcotics case. The agent also testified as to Schultz's informant role, including over 200 meetings and other contacts since 1976, the nature of the information provided by Schultz, and procedures concerning the contacts.

■ Therefore, Schultz does not meet the *Nixon* test since the testimony of the agent provided the information in the documents. Because Schultz was fully aware of what was in the documents, the due process concerns of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), are not involved. Moreover, the district court found that disclosure of the documents could jeopardize the safety of individuals discussed in the documents. Accordingly, the trial court did not abuse its discretion in quashing the subpoena.

*Jury Instruction on Schultz's Defense Theory*

■ Schultz argues that he was denied a fair trial because the trial judge refused to instruct the jury regarding his defense theory of assisting the FBI by setting up Nadell for arrest, and of determining, at the request of Einhorn's parents, if Einhorn was involved in drugs. Schultz's submitted instruction stated that the jury must find Schultz not guilty of Count One if they found that he joined the conspiracy "for the purposes of causing the arrest of Alan Nadell and others" and not for the purpose of cocaine distribution. The trial court gave a general instruction instead, stating that to find Schultz guilty, the jury must determine that he acted with the specific intent to violate the law and not because of mistake, accident, or other innocent reason.

■ Schultz cites no law that supports his argument that a defendant must be acquitted if he deliberately engages in criminal activity to gather evidence against the participants. Good motives are not a defense to conduct and do not show lack of criminal intent for conviction. *United States v. Howard*, 504 F.2d 1281, 1284 (8th Cir.1974). Moreover, Schultz does not meet the limited exception to this rule when a defendant has a justifiable and reasonable good faith belief that his conduct was previously authorized by government authority. Schultz does not claim this exception and the FBI agent who dealt with Schultz as an informant specifically testified that he had advised Schultz previously that he could not participate in any criminal activity and that Schultz never told him anything about the drug transactions in this case. *See United States v. Kelly*, 718 F.2d 661, 665 (4th Cir.1983). Furthermore, Schultz initially denied involvement in the transactions after Nadell's arrest. Finally, it seems that the general jury instruction given by the trial judge did not "fail[ ] to incorporate the thrust of the requested instruction." *Cincinnati Fluid Power, Inc. v. Rexnord, Inc.*, 797 F.2d 1386, 1392 (6th Cir.1986). Therefore, no error was committed.

*Prosecutorial Misconduct*

■ Schultz contends that his right to a fair trial was also violated by references to him as a member of organized crime and by the prosecuting attorney's reference to his failure to take the stand. In his closing statement, the prosecutor referred to the

defense counsel's opening statements that the defendant came from a poor family in which the alcoholic father beat the mother, etc. The prosecutor then stated "That may be true ... but it is not evidence in this case because did you hear that from the witness stand?" Defense counsel objected to the statement, stating in front of the jury that it was an improper reference to Schultz not testifying, and ·a bench conference was held. The court agreed that the statement was improper and cautioned the prosecutor that he was on thin ice. The court then reminded the jury that nothing presented by the attorneys in opening or closing remarks was evidence. Furthermore, several times in his charge to the jury, he reminded them that the defendant need not present any evidence that his decision not to take the stand should not be considered by them at all.

On appeal, the government argues that the prosecutor never directly or indirectly referred to Schultz's failure to testify but was only commenting that any assertions by the defense counsel made in opening statements were not evidence if they were not proved at trial. The government notes that Schultz could have presented evidence of his background through the testimony of others. We note that the comment may not have been intended to be, nor necessarily taken by the jury to be, a comment on Schultz's failure to take the stand. Furthermore, we conclude that even if the comment was error, it was harmless beyond a reasonable doubt because of the overwhelming evidence of guilt and the curative instructions of the court. Accordingly, reversal is not warranted.

■ During testimony by an FBI agent, the agent referred to Schultz as an "associated member of what we refer to here in Detroit as the organized crime family." The government argues that Schultz opened this issue by defense counsel's opening statements regarding his informant status (part of his defense theory) and association with Mafia figures Anthony Giacalone and "Jimmy" Hoffa (allegedly resulting in his wrongful prosecution in this case). The government was rebutting these defenses, and the FBI agent did not testify that Schultz took part in any of the criminal activity of which he provided intelligence information to the FBI. Moreover, the agent went on to qualify his definition of "associated member" as meaning that Schultz "had contacts and associations with these people." Therefore, the district court did not abuse its discretion in allowing this testimony.

*Admission of the cocaine from the delivery by Nadell*

Schultz argues that the half kilo of cocaine was improperly admitted because the evidence showed that Schultz was not involved in Nadell's attempted sale to Tuttle. Schultz argues that this delivery was made pursuant to a separate, independent conspiracy from February 16 to March 22, of which Schultz was not a part. The judge properly instructed the jury on this claim and no objection was made to the instruction. The jury was entitled to reject this claim and accept that of the government, namely, that the delivery was pursuant to a single conspiracy in which Schultz was involved. *See United States v. Warner*, 690 F.2d 545, 550–51 (6th Cir.1982). Therefore, the district court did not abuse its discretion in admitting the evidence.

*Federal Rule of Criminal Procedure 32*

■ Rule 32 requires that prior to sentencing, the court must "determine that the defendant and the defendant's counsel have had the opportunity to read and discuss the presentence report." Fed.R. Crim.P. 32(a)(1)(A). If the procedures are not followed, this court should remand for re-sentencing. *See United States v. Manni*, 810 F.2d 80 (6th Cir.1987).

At Schultz's sentencing, after the court pronounced sentence and announced recess, the government attorney immediately stated "Your Honor, if I may, pertaining to Rule 32, I'm not sure counsel and Mr. Schultz acknowledged receipt of the presentence report, nor of their right to appeal." Defense counsel responded, "That's correct, your Honor. We do acknowledge receipt of the pre-sentence report." The court then recessed.

Schultz argues that the technical requirements of the rule were not met because the court did not ascertain that Schultz had read and discussed the presentence report. But defense counsel did not object to not having the *opportunity* to do so, and in fact acknowledged receipt of the report. Moreover, in his lengthy, impassioned statement to the court during the sentencing proceeding, in which he went into detail about Schultz's age, health, family situation, standing in the community, and humiliation as a result of the trial, counsel did not challenge any aspect of the report. Since Schultz had the report and had the opportunity to object but did not, we infer that he had no objections to the report. Therefore, the requirements of the rule were substantially satisfied and this claim has no merit.

*Sentencing "Inconsistency"*

Schultz alleges that an inconsistency exists between the fine imposed on Counts One and Two at oral sentencing and the written judgment and commitment order entered the next day. Because of this, he argues that the judgment and commitment order must be modified so that the two $250,000 fines "run concurrently," thus totalling only $250,000. Schultz bases this argument on the long line of cases that hold that when an oral sentence conflicts with the written sentence, the oral sentence controls. *See, e.g., Hill v. United States ex rel. Wampler,* 298 U.S. 460, 56 S.Ct. 760, 80 L.Ed. 1283 (1936). Schultz's reliance on these cases is misplaced and there is no merit to his argument.

A close reading of the oral sentence reveals that the judge expressly limited the concurrent part of the sentence to the "[c]ustody sentence." Therefore, no true inconsistency exists. The cases hold that "[i]n the absence of clear language indicating consecutive sentences, it will be presumed that sentences imposed are concurrent. Where there is ambiguity, however, courts have usually been able to divine the intent of the sentencing judge." C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 527, at 116 (1982). Here, if there is any ambiguity, it can be resolved by looking at the written judgment, which provides that the total fine is $500,000, and the oral sentence, in which the judge states that the *custody* sentence is to run concurrently. Therefore, the written judgment will not be modified.

Based on the foregoing determinations, we AFFIRM the defendant's conviction on all counts.