David S. BOUTROS, Plaintiff–Appellant,

v.

CANTON REGIONAL TRANSIT AUTHORITY, et al., Defendants–Appellees.

No. 91–3535.

United States Court of Appeals, Sixth Circuit.

Argued March 5, 1993.

Decided June 30, 1993.

Rehearing Denied Aug. 18, 1993.

Edward L. Gilbert (argued and briefed), Akron, OH, for plaintiff-appellant.

Mary E. Randall (argued and briefed), John D. Jolliffe, Black, McCuskey, Souers & Arbaugh, Canton, OH, for defendants-appellees.

Before KEITH and BATCHELDER, Circuit Judges; and TAYLOR, District Judge.*

ANNA DIGGS TAYLOR, District Judge.

In this employment discrimination case, David Boutros appeals the district court's grant of a motion for directed verdict in favor of Defendants at the close of Plaintiff's case, on the basis of its conclusions that Plaintiff's claim of national origin harassment is not actionable under 42 U.S.C. § 1983, and that even if it were, sufficient evidence had not been adduced to raise a jury question. Boutros also claims error in the district court's admission of certain "extrinsic evidence" concerning his alleged misconduct, for the putative purpose of attacking his credibility as a witness.

Appellant's complaint stated causes of action under 42 U.S.C. § 1981, 42 U.S.C. § 2000e et seq. (Title VII), and three separate claims under 42 U.S.C. § 1983, for (1) national origin harassment, (2) wrongful discriminatory termination, and (3) deprivation of procedural due process rights. The district court granted Defendants' pre-trial motions to dismiss the Title VII and 42 U.S.C. § 1981 claims. At the close of Plaintiff's case, the district court directed a verdict for the Defendants on Plaintiff's claim of deprivation of procedural due process rights under 42 U.S.C. § 1983, as well as on Plaintiff's national origin harassment claim filed pursuant to 42 U.S.C. § 1983. The sole issue presented to the jury, therefore, was Plaintiff's claim of wrongful discriminatory termination, which the jury decided in favor of the Defendants.

Appellant Boutros here cites to trial testimony reflecting that numerous disparaging ethnic stereotypical epithets were directed towards him or stated in his presence, either by or with the knowledge of his supervisors, throughout his term of employment with the Appellees. He presented evidence that, *inter alia*, he was repeatedly called a "camel jockey" or "camel rider" by the management and employees of the Transit Authority, in demeaning reference to his Arab ancestry. The effect of such national origin harass-

ment, Appellant maintains, was to create a hostile work environment on the basis of his ethnicity. The district court found that national origin harassment was not actionable under 42 U.S.C. § 1983. Further, the district court stated that even if such harassment were actionable under 42 U.S.C. § 1983, the incidents alleged were not so egregious as to create a hostile work environment which seriously affected the Appellant's work performance or psychological well-being.

We agree with Appellant's contention that his claim of national origin harassment in the employment context is actionable under 42 U.S.C. § 1983, and that he presented sufficient evidence to withstand a motion for directed verdict on that claim. Accordingly, we reverse the district court's grant of the defense motion for directed verdict and remand for proceedings consistent with this opinion. With respect to the admission of evidence of Boutros' conduct relevant to his employer's grounds for discharge, which he characterizes as "extrinsic", we affirm the district court's ruling.

Appellant David L. Boutros was born in Damascus, Syria, and immigrated to the United States at the age of eleven in 1963. In August 1977, Boutros was hired by Defendant Canton Regional Transit Authority ("CRTA") as a bus driver. During his tenure at CRTA, Boutros was subjected to numerous open ethnic slurs from other drivers of which management was aware as well as from members of management itself. Although such conduct is prohibited by the Authority, the record reflects that no drivers were disciplined for such remarks. Moreover, when National Transit Services ("NTS") took over management operations at CRTA, Boutros testified that he was subjected to increased national origin harassment from other drivers as well as from even the new management. The record includes testimony that Director of Transportation Jack Winegarter made ethnic slurs when referring to Boutros within the latter's hearing; that Winegarter's later replacement, Ronald

* The Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michi-  gan, sitting by designation.

Dodsworth, described Boutros to another driver as a "camel jockey", and placed his name on a "hit list" of employees to be terminated; that during a driver training session and in Plaintiff's presence, Dodsworth referred to Boutros as "rug peddler" and a "heeb"; that Boutros was instructed to depart from standard procedures on occasion by deadheading and making route detours, and then disciplined for not following standard procedure; and that NTS General Manager Rosa made several derogatory comments regarding Boutros' Arab ancestry, within his hearing.

Boutros testified that Messrs. Winegarter, Dodsworth, and Rosa were supervisors and reported to NTS corporate headquarters in Chicago. Further, union representative McLaughlin, who represented Boutros at a disciplinary hearing, testified that Jim Rosa and Jack Winegarter were a team at CRTA, with Winegarter handling most of the disciplinary actions. Hence, the incidents to which Boutros testified clearly involved management and, in the case of Winegarter and Dodsworth, managers who were empowered to discipline and terminate drivers, as was ultimately done with Boutros.

Boutros testified concerning the statements of Jack Winegarter as follows:

"Where you come from—originally he said, you are a rich Arab. You own a restaurant and all sort of things and you don't need RTA and you should go back to Syria and fight the Israel Army and kill the Jews."

"He said, because I felt very, very bad, he said, [y]ou are a rich Arab. Why don't you go back to Syria. [sic] Why don't you go kill the Jews. [sic] You have lots of money I bet you have your first dollar that you made when you came to America. This is a great country, huh?"

Boutros further testified that Winegarter said "where you came from, you have no vehicles. You don't know what a bus is and you don't know what cars are." Moreover, according to Boutros, when Rosa, the general manager of operations, was present he did not reprimand Winegarter for making such remarks. Instead, according to Boutros, Rosa said, "I agree with Jack and you have

lots of money and your cousin on the street owns a restaurant you don't need RTA." When asked whether he considered "rich Arab" to be a slur, Boutros stated, "[o]f course, because the reason he said you are rich, you have oil, we don't need you here. You don't need to be a bus driver."

When asked how Winegarter's statements had affected him, Boutros testified, "I felt very, very bad. I mean, if someone kept calling you names and you don't need the job . . .—sometimes I thought my performance was going to really fail but thank God, it did not."

After Jack Winegarter was replaced by Ron Dodsworth, Boutros testified that the harassment continued. Specifically, he stated that at union disciplinary hearings, Dodsworth would continually refer to him as a "camel jockey" or "camel rider". Boutros further testified that he considered such terms to be derogatory and that at union hearings Dodsworth would refer to him within his hearing, using such phrases as "bring in the camel jockey" and "bring the rich Arab."

McLaughlin corroborated Boutros' testimony stating that he was not aware of management disciplining any of the drivers who harassed Boutros, despite their knowledge of the harassment. Specifically, McLaughlin testified that "[w]hen it was time for David [Boutros] to be brought into the room, I would be sent to get him. He [Dodsworth] said, [b]ring in the camel jockey or bring in the Arab. It was an accepted term for David." Boutros, outside the door, heard those statements. Similarly, the testimony of driving instructor, Pete Williams, was that he met with Dodsworth, and that Dodsworth, the supervisor who had replaced Winegarter, had a 'hit list' on his desk of drivers whom he planned to terminate. According to Williams, Dodsworth read the names on the list and when he reached Boutros' name, he said "[w]e are going to get rid of that camel jockey." Williams further stated ". . . as soon as he said camel jockey I knew who it was, but I said, '[w]ho is that' ". According to Williams, Dodsworth's reply was "Dave Boutros".

At trial, Dodsworth denied all of the aforementioned allegations. The district court made no finding as to the credibility of Dodsworth's testimony as opposed to that of Boutros and his witnesses. Moreover, it is not the function of the trial court but rather that of the jury to make credibility determinations on disputed questions of fact. If sufficient evidence is presented in Plaintiff's case for a reasonable juror, if he or she found it credible, to find in Plaintiff's favor, the case must be submitted. All credibility questions must be considered most favorably to the nonmoving party, and their resolution left to the jury. *United States v. Evans*, 883 F.2d 496, 501 (6th Cir.1989) ("[i]ssues of witness credibility ... are strictly for the jury to determine"), *citing United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir.1988); *Chrysler Workers Ass'n. v. Chrysler Corporation*, 834 F.2d 573, 578 (6th Cir.1987) ("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge,...."), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 216 (1986).

The district court concluded, however, that national origin harassment was not actionable under § 1983 and that even if it were, the Plaintiff's case failed to raise a jury question of a hostile work environment.

A. National Origin Harassment, Section 1983 and Title VII.

When the ethnic slurs of his co-workers and supervisors were not directed towards him, Plaintiff testified that they were used in his presence, and that supervision was well aware of those of more subordinate coworkers. Hence, Plaintiff contends that the effect of that alleged national origin harassment was the creation of an offensive hostile work environment which was deeply wounding to his psychological well-being and made him fearful for his performance, for which he was finally discharged.

As 42 U.S.C. § 1983 and Title VII are largely parallel remedies in employment discrimination suits, an examination of the standards under Title VII for a *prima facie* case

of harassment rising to the level of a hostile work environment due to national origin is useful in ascertaining whether Boutros' claim is actionable under 42 U.S.C. § 1983. This Circuit has held that the required elements of *prima facie* proof necessary for a plaintiff charging a racially hostile work environment under both Title VII and 42 U.S.C. § 1983 are the same. *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 483 (6th Cir.1989), *citing Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 924 (5th Cir.1982), *citing Rogers v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir.1971), *cert denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), which held that a Plaintiff may establish a Title VII violation by showing a racially hostile work environment affecting the psychological and emotional stability of minority-group workers; *See also Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir.1986), holding that proof of liability for a racially hostile work environment is the same under Title VII, 42 U.S.C. § 1981 and § 1983.

In *Rivera v. City of Wichita Falls*, 665 F.2d 531, 534 n. 4 (5th Cir.1982), the Fifth Circuit also stated that "when § 1983 is used as a parallel remedy with title VII in a discrimination suit, the elements of the substantive cause of action are the same under both statutes." *Id.* at 534 n. 4, *citing Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir.1980); *Alexander v. Chicago Park District*, 773 F.2d 850, 856 (7th Cir.1985). Similarly, in *Carrion v. Yeshiva University*, 535 F.2d 722, 729 (2d Cir.1976), the Second Circuit holding was that "[n]o greater or lesser protection against discriminatory practices is provided" by section 1983 than by Title VII. *See also Huebschen v. Dept. of Health and Social Services*, 716 F.2d 1167, 1170 (7th Cir.1983).

Moreover, the administrative guidelines endorsed by the Supreme Court in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) and defining sex-based harassment are, by their terms, to be analogized to national origin harassment. The EEOC Compliance Manual and guidelines, to which the Supreme Court in *Vinson*, *supra* refers us for guidance, expressly indicate that "[t]he principles involved here con-

tinue to apply to race, color, religion or national origin." 29 C.F.R. § 1604.11(a), at 193 n. 1 (July 1, 1988); *see also Risinger v. Ohio Bureau of Workers' Compensation,* 883 F.2d 475, 484 n. 3 (6th Cir.1989). Further, the EEOC Compliance Manual, also quoted in *Patterson v. McLean,* 491 U.S. 164, 180, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132, 152–53 (1989), provides that "the principles applicable to sexual harassment continue to apply to harassment on the basis of race, color, religion, or national origin." EEOC Compliance Manual § 615.7 (Harassment on the Bases of Race, Religion, and National Origin) (b) (Applicable Principles and Standards), *quoting with approval, Vinson, supra,* 477 U.S. at 65–66, 106 S.Ct. at 2404–05; *cf. Price Waterhouse v. Hopkins,* 490 U.S. 228, 243 n. 9, 109 S.Ct. 1775, 1787, n. 9, 104 L.Ed.2d 268, 283 n. 9 (1989). In *Price Waterhouse,* after observing that Title VII "on its face treats each of the enumerated categories [including race and sex] exactly the same," the Court concluded that the legislative history of the statute was applicable both to race and sex, and that the standards enunciated in that opinion "apply with equal force to discrimination based on race, religion, or national origin."; *Risinger, supra,* 883 F.2d at 485.

In *Rabidue v. Osceola Ref. Co.,* 805 F.2d 611, 619–20 (6th Cir.1986), *cert. denied* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), this Circuit defined the requisite elements of proof for an action claiming a sexually hostile work environment under either Title VII or § 1983. *Rabidue* identified the five elements as follows:

> [T]o prevail in a Title VII offensive work environment sexual harassment action, [the claimant] must assert and prove that: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment in the form of ... verbal ... conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment that affected seriously the psychological well-being of the plaintiff; and (5) the existence of *respondeat superior* liability.

*Id.* 805 F.2d at 619–20, *Risinger v. Ohio Bureau of Workers' Compensation,* 883 F.2d 475, 484 (6th Cir.1989); *Highlander v. K.F.C. Nat'l Mgmt. Co.,* 805 F.2d 644, 649 (6th Cir.1986); *accord Yates v. Avco Corp.,* 819 F.2d 630, 633 (6th Cir.1987).

The elements of *prima facie* proof enunciated in *Rabidue* were derived from the EEOC administrative guidelines, as directed by the Supreme Court in *Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. at 2404–05 (1986). *Rabidue, supra,* 805 F.2d at 619–20; *Risinger, supra,* 883 F.2d at 484. As the elements detailed in *Rabidue* and *Risinger* are derivatives of the EEOC guidelines and the EEOC Compliance Manual stated that those principles continue to apply to, *inter alia,* national origin, the case law governing claims of a racially or sexually hostile work environment are appropriate measures of the case at bar. To the extent, therefore, that *Rabidue* and *Risinger* state the elements necessary to state a claim of racially or sexually hostile work environments under § 1983 as companion claims to those made under Title VII, a national origin harassment claim satisfying those same elements is equally actionable under both 42 U.S.C. § 1983 and Title VII.

Appellees argue that Boutros failed to raise a jury question as to whether the harassment of which he complained was based upon national origin, or that it created an intimidating, hostile or offensive work environment to the extent that his work performance or psychological well-being was adversely affected. Appellees also argue that Boutros did not offer any evidence that the harassment was based upon his national origin, as opposed to his personal characteristics; and further argue that the most Boutros ever stated about an adverse impact was that he felt badly and that the harassment bothered him.

However, a careful review of the trial record discloses that Plaintiff repeatedly testified that he felt "very, very bad" because of the alleged national origin harassment. Additionally, he testified that sometimes he thought his work performance "was going to really fail but thank God, it did not." Clearly, in assessing whether the alleged harass-

ment "unreasonably interfered with" his work performance, as *Rabidue, supra,* requires, Boutros' testimony indicates his opinion that, although his work performance did not *fail,* it was certainly being *affected.*

The trial court erred in concluding that national origin harassment is not actionable under § 1983, and again in finding that Boutros had made no allegation of a hostile work environment in his complaint and that even if he had, "the proof is not there" to support a hostile work environment claim. Appellant did not use the term "hostile work environment" in his complaint but an examination of his pleadings reveals that he presented that claim in pleading that the Defendants' actions "harass[ed] and insult[ed] Plaintiff during the course of his employment". Moreover, Boutros pleaded and later proved sufficient facts concerning the nature and extent of the Appellees' alleged discriminatory actions to clearly evidence his position that harassment because of his national origin had made his work environment a hostile one.

■ The district court relied upon *Trautvetter v. Quick,* 916 F.2d 1140 (7th Cir.1990), in which the Seventh Circuit held that the plaintiff had no § 1983 claim, on evidence that the sexual advances of that Defendant had been motivated by Plaintiff's personal conduct or characteristics and not merely her gender. The district court in this case reasoned that here, as in *Trautvetter,* the alleged harassment towards Boutros was motivated by his personal characteristics and not the generic status of his national origin. It concluded that:

> "[i]f you could establish a 1983 claim simply by evidence of verbal abuse in terms of ethnic reference, certainly you should be able to establish a 1983 claim of sex discrimination by showing that a male was making unwanted advances...."

In sum, the trial court explained its ruling by stating that, to permit the establishment of a § 1983 case simply by evidence of verbal abuse would be "boot-strapping" the verbal abuse to prove the class-based animus, or that the national origin was the reason for the harassment.

However, the trial court here failed to note that the *Trautvetter* court did acknowledge that indeed some sexual comments and advances may not be the result of personal relationships, or characteristics, as in that case, but may be motivated unlawfully by the Plaintiff's gender, alone. Cases of unwanted sexual advances or harassment motivated by gender alone are indisputably actionable under § 1983. For example, *Bohen v. City of East Chicago,* 799 F.2d 1180 (7th Cir.1986), held that § 1983 requires a plaintiff to show that she was treated in a discriminatory manner based merely upon her membership in a protected class.

The trial record below provides numerous examples of harassment which cannot be attributed to Boutros' personal characteristics. He was repeatedly referred to as a "camel jockey", a "rich Arab", and as a person who would never be able to drive a bus because he came from a land without motor vehicles. All of those references are to nothing but Plaintiff's national origin and Arab ancestry. Hence, *Trautvetter, supra,* appears to be inapposite; and the questions of intent and motive, moreover, were for the jury to decide in this case.

## B. Admission of "Extrinsic Evidence"

■ Mr. Boutros also challenges the admission of "extrinsic evidence" from a defense witness who testified to his alleged past misconduct on the job. He argues that this was used to attack his credibility as a witness in violation of Federal Rule of Evidence 608(b). That Rule provides in pertinent part that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence...."

The extrinsic evidence in question, however, was the testimony of Shirene Straka, a female passenger on Boutros' bus route. Straka testified that Boutros behaved inappropriately towards her and that she filed a complaint with the CRTA against him which was investigated by Mr. Dodsworth, and which eventually led to Plaintiff's suspension. As Plaintiff had made a claim of wrongful discriminatory termination and Straka's tes-

timony had direct bearing on the alleged misconduct which Defendants claim had led to his discharge, it was not received solely for impeachment purposes. Boutros had denied the alleged misconduct, and Straka's testimony was directly related to material issues: whether or not the incidents occurred and whether or not the termination was wrongful. *See George Lamborn, Henry Maringer and Lamar Commodities v. Thomas H. Dittmer and Dittmer International, Inc.*, 873 F.2d 522 (2d Cir.1989), which held that Rule 608(b) is not applicable in determining the admissibility of evidence introduced to impeach the witness' testimony as to a material issue. Also, in *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527 (4th Cir.1985), the Fourth Circuit held that Rule 608(b) should not be read so broadly as to disallow the presentation of extrinsic evidence that is probative of a material issue in a case. Again, in *United States v. Opager*, 589 F.2d 799, 802 (5th Cir.1979), it was held that Rule 608(b) is inapplicable in determining the admissibility of relevant evidence to contradict a witness' testimony as to a material issue. Hence, the district court's ruling on the admission of extrinsic evidence is affirmed.

Accordingly, we reverse and remand on the dismissal of Plaintiff's claim of national origin harassment. There was no error, however, in permitting the Straka testimony in defense against the wrongful discharge claim.

BATCHELDER, Circuit Judge, concurring in part, dissenting in part.

I concur with the majority's affirmance of the district court on the extrinsic evidence issue. However, I dissent from the majority's reversal of the district court's granting of a directed verdict for the defendant on the claim of national origin harassment under 42 U.S.C. § 1983. I would affirm the district court's findings that national origin harassment alone is not actionable under section 1983, that plaintiff did not allege a hostile work environment, and that, in any case, plaintiff Boutros did not present sufficient evidence to make out a claim of a hostile work environment.

This Court is to review the grant of a directed verdict using the same standard that the district court applied in deciding whether to grant a directed verdict. *O'Neal v. Burger Chef Systems, Inc.*, 860 F.2d 1341, 1347 (6th Cir.1988). In a case based on federal question jurisdiction,

" '[T]he standard to be applied in determining the propriety of a grant or denial of a directed verdict is whether the evidence is such, without weighing the credibility of the witnesses or considering the weight of the evidence, that there is substantial evidence from which the jury could find in favor of the party against whom the motion is made. Only when it is clear that reasonable people could come to but one conclusion from the evidence should a court grant a motion for directed verdict.' "

*Hill v. McIntyre*, 884 F.2d 271, 274 (6th Cir.1989) (citation omitted). I believe that a jury could reach but one conclusion here.

I agree with the majority that a jury could find, based on the evidence presented at trial, that Boutros was verbally harassed by his supervisors and by co-workers on the basis of his national origin. I also agree with the majority that *Trautvetter v. Quick*, 916 F.2d 1140 (7th Cir.1990)—a Seventh Circuit decision whose holding has not been accepted by this Circuit—is not applicable in this case involving national origin harassment. Unlike the verbal sexual abuse in *Trautvetter* that the court attributed to the plaintiff's personal conduct or characteristics and not her sex, here the verbal abuse—consisting of such comments as "camel jockey", "camel rider", "rug peddler", "rich Arab", and killer of Jews—clearly was directed at Boutros's national origin and not at his personal characteristics. I also agree that the analysis for a claim of national origin harassment under section 1983 is the same as that used for Title VII harassment claims. *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 483 (6th Cir.1989).

However, I dissent from the majority's holding that national origin harassment alone can be actionable under section 1983. The majority states that plaintiff's "claim of national origin harassment in the employment context is actionable under 42 U.S.C.

§ 1983;" that the trial court "erred in concluding that national origin harassment is not actionable under § 1983, and again in finding that Boutros had made no allegation of a hostile work environment ...;" and that "[c]ases of unwanted sexual advances or harassment motivated by gender alone are indisputably actionable under § 1983." These statements indicate that the majority believes that national origin harassment without more is actionable under section 1983 as an equal protection violation. Nonetheless, although relying both on that misconception and the misconception that Boutros raised a hostile work environment claim in his pleadings and in the trial court, the majority correctly focuses on whether the harassment in this case created a hostile work environment. This was the correct focus because, as the district court found, verbal harassment based on national origin is actionable *only* if such verbal harassment rises to the level of a hostile work environment.

Although there is little case law discussing section 1983 or Title VII harassment claims not alleging a hostile work environment, the case law indicates that claims based only on allegations of ethnic slurs are not enough. Harassment does not rise to an actionable level unless it is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (citation omitted). As the Supreme Court noted in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), " 'harassment [which is] sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment," ' [*Vinson*, 477 U.S. at 67, 106 S.Ct. at 2406], is actionable under Title VII because it 'affects a "term, condition, or privilege" of employment.'" *Id.* 491 U.S. at 180, 109 S.Ct. at 2374 (quoting *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2406).

At least as to racial harassment claims in this Circuit, this "pervasive" misconduct standard translates into two requirements: " 'repeated slurs and management's tolerance

and condonation of the situation.' " *Nelms v. Montgomery Cty. Combined Health Dist.*, 915 F.2d 1572 (6th Cir.1990) (unpublished per curiam) (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345 (6th Cir.1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989)). In *Davis v. Monsanto Chem. Co.*, 858 F.2d 345 (6th Cir.1988), we discussed this two-part test by holding that 1) to meet the "repeated slurs" factor, the plaintiff must show that the harassment "constituted an unreasonably abusive or offensive work-related environment or adversely affected the reasonable employee's ability to perform the tasks," and 2) to meet the "tolerance" requirement, the plaintiff must establish that the employer "knew or should have known of the alleged conduct and failed to take prompt remedial action." *Id.* at 349.

In *Risinger*, 883 F.2d at 485, another panel of the Court, sitting a year after the *Davis* decision, applied a slightly different test to racial harassment claims. *Id.* The *Risinger* panel indicated that *Davis* was a departure from *Patterson v. McLean Credit Union* and *Rabidue v. Osceola Refining Co.*, 805 F.2d 611 (6th Cir.), *cert. denied*, 481 U.S. 1041, 107 S.Ct.1983, 95 L.Ed.2d 823 (1987), in that the test laid out in *Rabidue* should apply to both racial and sexual harassment claims. As the majority in this case noted, the *Risinger* court set out the five requirements under *Rabidue* for making out a hostile work environment sexual harassment claim in this Circuit:

> [T]o prevail in a Title VII offensive work environment sexual harassment action, [the claimant] must assert and prove that: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcomed sexual harassment in the form of ... verbal ... conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment that affected seriously the psychological well-being of the plaintiff; and (5) the existence of respondeat superior liability.

*Rabidue*, 805 F.2d at 619–20. *See Nelms*, 915 F.2d 1572 (6th Cir.1990) (unpublished per curiam) (acknowledging the differing tests and following the *Davis* test).

Because this Court has held that the principles governing sexual harassment claims apply equally to harassment claims based on race, religion or national origin, *Risinger*, 883 F.2d at 485 (citing *EEOC Compliance Manual*), these *Rabidue* requirements apply to Boutros's national origin harassment claim. Both the *Davis* and *Rabidue/Risinger* tests dictate that verbal abuse and slurs alone are not enough to make out an actionable claim, but that this harassment must be so pervasive as to create a hostile work environment. *See also Valdez v. Mercy Hosp.*, 961 F.2d 1401, 1402–03 (8th Cir.1992) (ethnic jokes did not rise to level of severity to demonstrate hostile work environment); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1270 (7th Cir. 1991) (Title VII claim made out if "quantity and frequency" of racial and ethnic slurs make harassment "pervasive"); *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1385 (10th Cir.1991) (ethnic slurs did not unreasonably interfere with work performance or affect employment opportunities); *Erebia v. Chrysler Plastics Prods. Corp.*, 772 F.2d 1250, 1254–57 (6th Cir.1985) (ethnic harassment must be pervasive so as to alter employment conditions), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986).

I disagree with the majority that Boutros has made out a claim of hostile work environment. First, the majority states that "[p]laintiff contends that the effect of that alleged national origin harassment was the creation of an offensive hostile work environment which was deeply wounding to his psychological well-being and made him fearful for his performance, for which he was finally discharged." However, although the majority may contend this, Boutros in fact did not. Boutros did not plead a hostile work environment claim in his complaint. Contrary to the majority's view, I do not believe that plaintiff's complaint sufficiently states a claim of a hostile work environment merely by alleging that defendants' actions violated his equal protection rights "[b]y harassing and insulting Plaintiff during the course of his employment" or "[b]y using his national origin in a discriminatory manner, i.e., calling him insulting and derogatory racial names designed only to belittle and degrade the Plaintiff." Although the complaint uses the word "harass[ ]", this is not sufficient to state a claim for pervasive verbal abuse amounting to a hostile work environment. Second, in his initial appellate brief, Boutros does not contend that he has made out a claim of hostile work environment but only argues that a section 1983 claim based on national origin verbal abuse is actionable. Only in his reply brief does Boutros raise the issue of a hostile work environment and claim that he presented sufficient evidence on this issue to withstand a directed verdict. However, an issue raised for the first time in a reply brief will not be considered on appeal. *Pachla v. Saunders System, Inc.*, 899 F.2d 496, 502 (6th Cir.1990). Because plaintiff has neither pled a claim of hostile work environment nor timely raised it on appeal, I believe this Court may not address the issue. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 243 (6th Cir.1991) (issue not raised in district court cannot be addressed on appeal).

Even if Boutros had stated a hostile work environment claim, I would hold that the district court did not err in granting a directed verdict for defendants because there was not sufficient evidence from which a jury could find that the abuse to which plaintiff was subjected was sufficiently pervasive to constitute a hostile work environment. Plaintiff testified that on several occasions he was called names relating to his national origin by Director of Transportation Jack Winegarter and by NTS General Manager Jim Rosa, and that Rosa once stated that he agreed with Winegarter's ethnic slurs. Boutros explained his reaction to these slurs:

> I felt very, very bad. I mean, if someone kept calling you names and you don't need the job here and you get to the point— sometimes I thought my performance was going to really fail but thank God, it did not.

He also stated that Winegarter's "camel jockey" reference was derogatory and that he "took it very hard." He noted that other

drivers made comments about his national origin, but he gave no specifics except that he told them not to say those things. And, Boutros testified that Winegarter's successor, Ronald Dodsworth, called plaintiff a "camel jockey", a "heeb", and an "rich Arab" to a third person and that plaintiff overheard these comments outside the room, and that Dodsworth made slurs directly to him on other occasions.

However, none of this verbal harassment rises to the level of creating a hostile work environment. Under the *Rabidue* standard, plaintiff's evidence wholly failed to show that the harassment "had the effect of *unreasonably* interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment that affected *seriously* the psychological well-being of the plaintiff." *Rabidue,* 805 F.2d at 619–20 (emphasis added). *Both* unreasonable interference with work performance and serious effect on psychological well-being are necessary under *Rabidue* to make out a hostile work environment claim. Except for Boutros's comments that the slurs made him feel "very, very bad" and that he took the slurs "hard", he presented no evidence that the slurs unreasonably interfered with his work performance *or* that they created an environment so hostile that it seriously affected his psychological well-being. In fact, Boutros stated that although he feared his performance was going to fail, "thank God, it did not." The majority relies on this statement as evidence that his work performance was affected by the slurs, although not actually hindered. However, the test is not whether Boutros feared his work would suffer, or even whether his work was affected, but whether in fact the harassment "had the effect of unreasonably interfering" with his work performance. The majority does not even address the necessity that plaintiff present evidence that the slurs had a serious effect on his psychological well-being. But clearly, plaintiff's statements about feeling bad do not amount to serious psychological effect. And, even under the more-lenient *Davis* test, Boutros did not present evidence sufficient to make out the "repeated slurs" factor by showing that the harassment "constituted an unreasonably abusive or offensive work-related environment or adversely affected the reasonable employee's ability to perform the tasks." *Davis,* 858 F.2d at 349.

I would find that Boutros has not attempted to state a hostile work environment claim, but even if he had, no jury could find, based upon the evidence presented, that the verbal harassment created a hostile work environment actionable under section 1983. Accordingly, I would affirm the district court's grant of a directed verdict.